JOHN G. POWELL, ADMINISTRATOR OF SIMON PARTRIDGE, DECEASED, VS. THOMAS K. LEONARD.

9    359
44   711
45   334

1. Delivery of the thing donated is essential to the perfection of the gift, whether it be made *inter vivos* or *causa mortis*.

2. To determine the sufficiency of a delivery, reference must be had as well to the *nature* of the property as to its *locality*.

3. Acts which would be insufficient to constitute a good delivery of inanimate or unintelligent pioperty, might, under the accompanying circumstances, be deemed altogether sufficient to perfect the delivery of a slave possessed of understanding and volition.

4. Where a female slave is in the chamber of her master, who is lying *in extremis*, and he directs a deed to be drawn up, giving her and her children to a person present at the time, this is a good delivery *causa mortis* of the mother and her children, though the children were absent from the chamber at the time of the gift.

5. And the fact that the mother and children continued to remain at the residence of their former master for a short time after his decease, which occurred within a few hours after the execution of the deed, did not operate to defeat the gift.

This case was decided at Tallahassee.

The facts in the case are set forth in the opinion of the Court.

*R. B. Hilton* and *J. B. Galbraith* for appellant.

*Papy & Archer* for appellees.

DuPONT, C. J., delivered the opinion of the Court.

This cause was instituted on the equity side of the Circuit Court of the Middle Circuit, and was heard and determined by the Hon. J. Wayles Baker, the Judge of said Court. The bill was filed by the appellant against the appellee, and the cause coming on to be heard upon demurrer, a decree was pronounced ordering the bill to be dismissed. From that decree this appeal has been taken.

The only question submitted for our adjudication, which it is material to consider, is whether the conveyance of the property as set forth in the bill can be sustained as a voluntary "gift," either "*inter vivos*" or "*causa mortis.*" The question of delivery being the only one contested in this investigation, we are relieved from a discussion of the attributes of a voluntary gift, and the numerous perplexing questions which are found in the reported cases touching the rights of creditors and the claims of legatees. In this case it is admitted that there are no creditors to contest, and the decedent dying intestate, there arises no question of conflict as to legacies.

It is insisted for the appellant that whether the conveyance be considered in the light of a gift "*inter vivos*" or "*causa mortis,*" the intention of the donor was never consummated; actual delivery of the property being essential and indispensable to the perfection of the title. In this respect we know of no difference between the two kinds of gifts, and the position assumed must be taken as admitted law. Blackstone says: "A true and proper gift or grant is always accompanied with delivery of possession, and takes effect immediately, as if A gives to B £100 or a flock of sheep, and puts him in possession of them directly, it is then a gift executed in the donee; and it is not in the donor's

power to retract it, though he did it without any considera-
tion or recompense, unless it be prejudicial to creditors, or
the donor were under any legal incapacity, as infancy, cover-
ture, duress, or the like ; or if he were drawn in, circumven-
ted or imposed upon by false pretences, ebriety or surprise.
But if the gift does not take effect by delivery of immediate
possession, it is then not properly a gift, but a contract, and
this man cannot be compelled to perform but upon good and
sufficient consideration."—2 Black. Com., 442.

In speaking of a donation " *causa mortis*," the same author
says—" that is, when a person in his last sickness, apprehend-
ing his dissolution near, delivers or causes to be delivered to
another the possession of any personal goods, to keep in case
of his decease. This gift, if the donor dies, needs not the
assent of his executor; yet it shall not prevail against cred-
itors ; and is accompanied with this implied trust, that if
the donor live, the property thereof shall revert to himself,
being only given in contemplation of death, or ' *causa mor-
tis.*' "—Ib. 514.

It will thus be seen that whether the gift be considered as
" *inter vivos*" or " *causa mortis*," a delivery of the pos-
session constitutes the chief element of title, and is indispen-
sable to the perfection thereof. What shall constitute a good
delivery is a question of much greater difficulty, and is often
attended with much perplexity. Its proper solution can
only be arrived at by considering, not only the locality of
the property, but also its nature and kind. As to the local-
ity of the thing donated, it is not always practicable to make
an actual tradition of the thing itself, and hence the delivery
of a written conveyance, as in the case of vessels at sea, or
of the keys, as in the case of goods in a warehouse, or trunk,
are sometimes resorted to as a proper mode of transfer, and
have ever been held to be a sufficient delivery.

A distinction has been made in some of the reported cases

362                    SUPREME COURT.

John G. Powell vs. Thomas K. Leonard.—Opinion of Court.

between a *symbolical* delivery, and the delivery of the *means* of obtaining the possession; it being held that the former is not sufficient to pass the property, while the latter constitutes a good delivery. But there is manifestly a lack of accuracy in the use of terms to convey the idea intended, for the written conveyance and the key referred to in the cases above cited are as truly *symbols*, as they are the *means* of obtaining the possession of the thing. The real difference, and one growing out of the nature of the thing itself, is between a transfer executed and one only executory, as in the case of a promissory note payable to bearer, and of one payable to order. In the former case, the gift is considered executed, and therefore good, because there is a perfect transfer of the debt and the means of recovery by the donee himself; whereas in the latter case, it requires the interposition of the donor, or in the case of death, of his legal representative, and consequently must have his assent.

Again, in considering what acts will constitute a sufficient delivery, reference ought to be had to the nature of the property or thing intended to be donated, for it is quite obvious that what might be esteemed a good delivery in the case of wild cattle or horses in the range, which might never be recovered by the donee, for the want of ability to control and reduce them to actual possession, might not be deemed sufficient in the case of inanimate articles, such as boxes or bales of merchandize or other articles.

And here again by analogy, there would seem to be a very wide difference between the acts which will constitute a delivery of animals as property, which have no volition or understanding, and such as possess these attributes. If a man *in extremis* were to declare to his dog or his favorite horse that he had given him to his intimate friend, and thereupon simply ordered him to repair to the residence of the intended donee, it would scarcely be seriously contended that these

acts were such as would support a gift. And yet such declaration and command might be of most potent significance if addressed to one possessed of volition and understanding, as a slave for instance, and capable of not only comprehending but of carrying out the behest of the donor. Suppose for instance that a man *in extremis* or otherwise, intending to make a gift of a slave to a son or daughter, not being a member of his household, should execute a proper deed for that purpose, and dispatch the slave with it to the intended donee, and before the arrival of the slave, or the delivery of the deed, the donor should suddenly die, can it be doubted but that the gift would be held to have been perfected by such delivery, so as to bar the title of the legal representative of the donor?

Applying these principles to the case at bar, I now proceed to consider the facts as set forth in the bill, and which are admitted by the demurrer. The essential details so set forth are as follows, to wit:

" That the said Simon Partridge," (the intestate of the appellant) " being in his last illness, was attended by the said Leonard (the appellee) as his physician ; that a few hours before the death of the said Partridge, the slave Ann above mentioned came into the room where he was, and in the presence of witnesses, told her master that she had selected Dr. Leonard for her future master ; that thereupon said Partridge, who was fully aware of approaching death, directed a bill of sale or conveyance of said slaves, (Ann and the others above mentioned,) to be drawn up, which was accordingly done by the said Leonard, and the said Partridge being too feeble to write his signature, one of the witnesses present guided his hand so as to affix his mark to said conveyance." " That the said slaves above specified were not present so as to be identified by any of the witnesses present at the above transaction." " That the said slaves remained

on the place until sometime after the death of Partridge, when Leonard came and wrongfully took them away."

The bill also gives the following description of the slaves enumerated in the deed, and above referred to, viz : " A woman named Ann, a mulatto about thirty years of age ; Arthur, son of Ann, a boy about three years old, a mulatto ; a yellow girl, child of Ann, about one year old, name unknown ; a negro girl named Milly, about ten years old, a daughter of Ann ; and yellow Harriet, a girl about eight years old, daughter of Ann."

From this description it will be noted that the slaves constituted one family, embracing the mother and her children, ranging in age from ten years to one.

Adverting to the incidents of the transaction, so circumstantially detailed, the impression is at once made that these slaves constituted a family of favorite servants, for whose welfare and happiness it was the earnest desire of their master to provide, as the last act of his life. The conclusion is also irresistible, that this desire had been previously communicated to these beneficiaries, and that the transfer to Dr. Leonard was only in execution of that design. We here behold the master *in extremis*, and perfectly conscious of his approaching dissolution : he is accosted by the mother of these children, all of whom are of tender age, and in the presence of witnesses, she informs him that she had selected Dr. Leonard for her future master. A deed of conveyance is drawn up, embracing the mother and her four children, and is duly signed by the donor, who dies in the space of a few hours afterwards. No fraud is alleged—no undue influence is intimated, but the transaction takes place in the light of day, and in the presence of unimpeached witnesses. The motive and design of the donor were certainly highly commendable, and his benevolent intention ought not to be defeated, if it can be consummated without doing violence

to the strict rules of law. We believe that this may be done. Whatever may be said of the absence and want of identity of the children, it is very certain that the argument does not apply to Ann, their mother. The statement of the bill is, that it was upon her personal application to her dying master that the gift was made, and it is a legitimate presumption that she was present at the very time that the deed was executed, which includes the names of her children.— Was anything more necessary to be done, to perfect the gift as to her? and if perfected as to the mother, shall it be held to be void as to the children? We think not. All the circumstances being taken together, we think that in this case the delivery of the mother was a sufficient delivery of the children. Adverting to the difference between slaves and all other kinds of property, in point of volition and understanding, the English adjudications afford us no safe guidance on this subject.

But it was further insisted for the appellant, that the remaining of the slaves on the plantation of the donor, after his decease, was sufficient to negative the fact of a sufficient delivery. Whatever influence this circumstance might have had upon a gift *inter vivos*, in the circumstances of this case, we are disposed to attribute to it very little importance. The statement of the bill upon this point is, " that the said slaves remained on the place until *sometime* after the death of Partridge." How long a time they so remained, we have no information—it might have been a day or a year. And taking into consideration the fact, that the donor died within a few hours after signing the deed, and that there was consequently no space allowed for the *locus penetentiæ*, we deem the circumstance wholly immaterial.

The argument was also pressed with much force, that in sustaining this transaction as a *donatio causa mortis*, the

policy of the statute regulating the execution of wills might be seriously disturbed.    We have given due consideration to the argument, but have been unable to appreciate its force. Fraud and imposition might be perpetrated as easily in the one case as in the other, and the mere difference in the *number* of witnesses required is deemed but of little importance, if a fraudulent design is contemplated.

Upon full consideration of all the facts of this case, and the law bearing thereon, we are of the opinion that the decree of the Court below should stand.

It is therefore ordered and adjudged that the decree of the Chancellor, ordering the bill filed in this case to be dismissed, be and the same is hereby *affirmed*, with costs.