461 So.2d 178 (1984)
W.F. YOST, Appellant/Cross-Appellee,
v.
RIEVE ENTERPRISES, INC., et al., Appellees/Cross-Appellants.
STIRRETT ENTERPRISES, INC., d/b/a V.R. Business Brokers, Appellants,
v.
W.F. YOST, Appellee.
Nos. AR-490, AS-411.
District Court of Appeal of Florida, First District.
December 11, 1984.
Rehearing Denied January 10, 1985.
*180 William G. Cooper of Kent, Watts, Durden, Kent, Nichols & Mickler, Jacksonville, for W.F. Yost.
John F. Callender of Turner, Ford & Callender, P.A., Jacksonville, for Stirrett Enterprises, Inc., d/b/a V.R. Business Brokers.
M.W. Goldstein of Goldstein & Goldstein, Jacksonville, for appellees.
ERVIN, Chief Judge.
These consolidated appeals and cross-appeal arise from a final judgment of the trial court in an action involving the purchase and sale of a restaurant. We affirm in part and reverse in part.
An action was instituted by Rieve Enterprises, Inc. (Rieve), against Yost for rescission and cancellation of an agreement and related documents executed between the parties to purchase the Red Barn Barbecue Restaurant (Red Barn), and for damages, based on false and fraudulent statements by Yost representing that the restaurant premises complied with all laws necessary to conduct the business and that all equipment was in working order and would pass inspections required for the operation of the restaurant. Yost later brought an action against Rieve for damages stemming from its default on the promissory note and breach of the security agreement. Meanwhile, Stirrett Enterprises, Inc. (Stirrett), Yost's real estate agent, also filed a complaint against Yost for the unpaid balance owing on a broker's commission. The cases were consolidated by the trial court and a jury was assigned to determine the issues of fraud by Yost and breach of the contracts by Rieve, while the issues of rescission and cancellation, and Stirrett's entitlement to the broker's commission were to be decided only by the trial judge.
Interested in buying a restaurant, Richard Ramano, his wife Evelyn Glenn, and her brother Richard Jason, of Rieve Enterprises, contacted Stirrett who had the exclusive listing agreement with Yost for the sale of the Red Barn.[1] After visiting and *181 conducting a visual inspection of the premises, Rieve entered into an agreement on January 11, 1982 to purchase the assets and equipment of the Red Barn, as well as a five-year lease of, and option to buy, the land and building. The Rieve group agreed to assume $10,000 in purveyors' bills, and executed a promissory note to Yost for the amount of $95,000, also granting to Yost a security interest in the restaurant's assets, as described in the security agreement, and agreed to pay $10,000 to Stirrett on February 1, 1982. Rieve paid an initial deposit of $10,000, and the additional amount of $10,005.82 on January 13, 1982, the date of the closing, against the total purchase price of $135,005.82.
Before the sale, the Rieve group did not make inquiries to Yost or Stirrett, or check the public records concerning previous health inspections, neither did Yost or Stirrett or Rieve's own visual inspection reveal any defects in the restaurant premises. Although the group's primary concern in acquiring the restaurant was directed to the volume of business rather than the physical characteristics of the premises, they nevertheless relied upon the following clause in the purchase and sale agreement provided by Stirrett: "Seller warrants that at the time physical possession is delivered to buyer, all equipment will be in working order and that the premises will pass all inspections necessary to conduct such business." Rieve took possession immediately after the sale of January 13, continuing the business until January 27, when the Board of Health conducted a routine inspection, citing fifty-two health code violations, and thereupon closed the restaurant.[2] The violations related to problems with electrical wiring, plumbing and sanitation, improper drainage, poor ventilation, and an improperly installed oven which consequently had to be condemned.
After shutting down the business, Ramano requested Yost to return to him the $20,005.82 paid, but did not ask him to make any repairs, although the lease on the building and land contained a provision whereby Yost, as landlord, was responsible for maintenance of such areas of the building as the roof, downspouts, and walls. On January 28, Yost, Ramano, Cristine Duris, the mortgagee of the restaurant premises, and Duris' attorney, met to discuss whether a plan could be devised to continue the operation of the business by the Rieve group in order to avoid foreclosure. Yost agreed to give a drainage and sewage easement across his property, and to make whatever repairs were necessary to open the restaurant. Ramano was unwilling to continue the business and, instead, abandoned the Red Barn and failed to make the $10,000 payment due on February the first, or any other payments connected with the transaction.
The jury returned a verdict, finding that fraud and deceit were practiced upon Rieve by Yost, awarding compensatory damages in favor of Rieve and against Yost in the sum of $10,000, while also finding that Rieve breached the contracts relating to the purchase of the Red Barn, although no damages were awarded to Yost. The trial court entered a final judgment in accordance with the verdict, and, by bench judgment, declared the promissory note, security *182 agreement and lease to be null and void, and ruled that Stirrett was not entitled to recover the balance of the brokerage commission from Yost.
Yost argues that rescission of the contracts was improper since no evidence was presented to demonstrate that he made any false or fraudulent representations to the Rieve group, and, although the contract warranted that the building would pass all inspections and the equipment would be in working order at the time possession was delivered to the buyer, he could not foresee that at some time thereafter the building and equipment would not fulfill those requirements. Rieve's counter-argument is that Yost's failure to reveal the material defects of which he had knowledge amounted to fraud, and that the contractual representation as to the condition of the premises and equipment was false.
The essential elements of a fraudulent representation upon which relief can be granted are (1) a false statement of fact by the defendant, (2) knowledge by the defendant that the statement was false at the time it was made,[3] (3) intent that the statement induce another to act in reliance thereon, and (4) actual reliance on the statement resulting in damage to the plaintiff. See Held v. Trafford Realty Company, 414 So.2d 631 (Fla. 5th DCA 1982). Misrepresentation of material facts, even though innocently made, acted upon by the other party to his detriment, will constitute a sufficient ground for rescission and cancellation in equity. The proper inquiry is not whether the party making the representation knew it to be false, but whether the other party believed it to be true and was misled by it in entering into the contract, so that whether the misrepresentation was innocently or knowingly made, the legal effect is the same. Langley v. Irons Land & Development Co., 94 Fla. 1010, 114 So. 769 (1927). Held at 632-33; Lynch v. Fanning, 440 So.2d 79, 80 (Fla. 1st DCA 1983). Additionally, the party guilty of the fraudulent misrepresentation may not be shielded by the doctrine of caveat emptor. Thus, the purchaser of business property is entitled to rely on the truth of the seller's representations even though the falsity could have been ascertained had the buyer made an investigation  unless the latter knew the representations to be false, or the falsity was obvious to him  if the seller, as owner of the property, had superior knowledge of its size, condition and income. Besett v. Basnett, 389 So.2d 995, 998 (Fla. 1980).
Based on the foregoing authorities, we find that the evidence below amply supports the trial court's rescission of the contracts on grounds of misrepresentations by Yost, in that the premises of the Barn did not pass the inspections necessary for conducting the business and some of the equipment was not in good working order, as warranted in the contract for purchase, and because the Rieve group relied on such contractual assurances  the falsity of which they neither knew nor was obvious to them  as inducement to purchase the restaurant causing them financial injury, regardless of whether the misrepresentations were knowingly or innocently made. There was abundant evidence from which the trial court could deduce that Rieve relied to its detriment upon the false representations of Yost, regardless of whether Yost made the representations innocently or with knowledge. Yost, the seller, either knew, or had reason to have known through previous violations that the premises could not comply with all laws necessary to conduct the restaurant. Less than two months before the execution of the purchase agreement, Yost was aware that the premises had been cited for a seeping sewage filter bed. Although a later reinspection reported that the defect had been corrected, Yost should have been aware, through the knowledge of his agent Albert, that the attempt made to remedy the problem was only a temporary, "band-aid" *183 measure. Albert had simply filled in the seeping area with sand, despite having received an estimate that the cost to repair it properly would be about $8,000 to $10,000. (Albert later testified that he had held the Red Barn together with "spit, nails and chewing gum.") After Rieve had abandoned the premises, the mortgagee's actual cost to repair the septic tank and adjoining area was $5,835 out of a total of $40,000 expended. Testimony was further adduced that it would have cost Rieve $18,000 in repairs to bring the premises in compliance with existing regulations.
Yost's second argument on appeal concerns the failure of the trial court to award damages caused by Rieve's default on the promissory note in that the jury's verdict found Rieve to have breached the purchase and sale contract, despite its failure to award damages to Yost as a result of the breach. On cross-appeal, Rieve asserts that the award of $10,000 damages was inadequate, since Rieve, as the defrauded party, should have been restored as nearly as possible to its original position by an award of the full $20,005.82 paid by it to Yost.
As to Yost's argument, we respond that a seller should not be allowed to profit from a transaction induced by fraud and misrepresentation, and it is within the discretion of the trial court to formulate equitable remedies, including rescission of the transaction and restoration of the parties to their original positions. See Florando Investment Corporation v. Fried, 412 So.2d 14 (Fla.2d DCA 1982). Moreover, a party may defend against liability on a claim or obligation by demonstrating that he was fraudulently induced to enter into a contract or transaction upon which such liability is asserted. See Poneleit v. Reksmad, Inc., 346 So.2d 615 (Fla.2d DCA 1977). The equitable remedy of rescission, as we have previously observed, was properly imposed. Accordingly, we find no abuse of the trial court's discretion in denying Yost damages caused by the breach of a contract, later rescinded on the ground of fraud.
As to the argument advanced in Rieve's cross-appeal, we agree. If rescission of the entire transaction is the proper remedy, the trial court should devise a formula placing the parties, as nearly as possible, in their original positions. Florando Investment Corporation v. Fried. The record discloses that Rieve paid the sum of $20,005.82 toward the total purchase price, yet was awarded only $10,000.00. Thus, the damages awarded were insufficient to return Rieve to its original position. We therefore reverse, in order that the remaining $10,005.82 paid to Yost in connection with the purchase of the Red Barn be refunded to Rieve.
Finally, Stirrett contends that an award of the balance of the commission was erroneously denied by the trial court in that the prerequisite to entitlement to the commission was satisfied because the sale of the Red Barn was "consummated." We do not need to reach the issue whether the sale was consummated, because the evidence discloses that Stirrett itself had unclean hands by participating in the misrepresentation to the Rieve group, inducing them to purchase the restaurant. Although the broker claimed he had no knowledge of the defects in the premises and equipment, Evelyn Glenn, one of the members of the Rieve group, testified at trial that before signing the purchase and sale agreement she had asked the broker whether he would, pursuant to the clause in the contract warranting the condition of the premises and equipment,[4] make sure that the restaurant would be operational and pass all health inspections. According to her testimony, his response was that it was his job and he would take care of it. This statement was denied by Stirrett at trial. His denial does not appear to have been made an issue on appeal; instead his argument is that even assuming the accuracy *184 of the statement, there was no obligation owed Rieve by Stirrett, and, at any event, Stirrett had no knowledge of wrongdoing by Yost. It is our obligation as an appellate body to affirm if there is any theory upon which the trial court might have denied Stirrett's action for the balance remaining unpaid on the brokerage agreement. See Stuart v. State, 360 So.2d 406, 408 (Fla. 1978); Cohen v. Mohawk, Inc., 137 So.2d 222 (Fla. 1962). Cohen states the above rule in the following language:
It should be kept in mind that the judgment of the trial court reached the district court clothed with a presumption in favor of its validity. 1 Fla. Law and Practice, Appeals, § 152, 2 Fla.Jur., Appeals, § 314, and authorities cited therein. Accordingly, if upon the pleadings and evidence before the trial court, there was any theory or principle of law which would support the trial court's judgment in favor of the plaintiffs, the district court was obliged to affirm that judgment.
In the opinion of this court, there are contained in the record facts which, if believed by the trial judge, are sufficient to support a judgment for the petitioners under the rule of law announced in McGehee Lumber Co. v. Tomlinson, supra. This being the case, the district court erred in failing to indulge the presumption in favor of the validity of the lower court's judgment.
137 So.2d at 225.
It is a fundamental principle of equity that no one shall be permitted to profit from his own fraud or wrongdoing, and that one who seeks the aid of equity must do so with clean hands. Hauer v. Thum, 67 So.2d 643 (Fla. 1953). There is no bar to applying the doctrine of unclean hands to a case in which both the plaintiff and the defendant are parties to a fraudulent transaction perpetrated on a third party. See Faber v. Landman, 123 So.2d 405 (Fla.2d DCA 1960); Hauer v. Thum. In that there was evidence from which the trial court could have found that Stirrett himself was a party to the fraud, it is therefore immaterial whether Stirrett himself had knowledge of the fact that the premises could not pass all health inspections. See Lynch v. Fanning. The denial of recovery of the balance of the broker's commission is affirmed.
The judgment of the trial court is AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings consistent with this opinion.
ZEHMER, J., concurs.
BOOTH, J., concurring in part and dissenting in part.
BOOTH, Judge, concurring in part and dissenting in part:
The testimony concerning Stirrett's participation in the misrepresentation was conflicting, was not addressed below, and should be resolved by the trial court on remand. Therefore, I would concur in the majority's opinion except as it requires this Court's undertaking, ab initio, to determine whether Stirrett himself was guilty of fraud or other conduct which would support the trial court's denial of the brokerage commission balance.
NOTES
[1] The exclusive listing agreement between Yost and Stirrett, referring to the sale of the Red Barn, provided "that sellers will pay broker a commission of $14,465 if consummated" and that $10,000 of that amount was to be paid by balloon note on February 1, 1982, the date that Yost was to receive payment from Rieve. Although $4,465 of the commission was paid to Stirrett, the $10,000 payment due on February the first was never made. (e.s.)
[2] The violations of January 27 were not the first to occur at the Red Barn premises. A health inspection report of the Red Barn dated May 13, 1981, stated that the plumbing and septic tank needed correction without delay, and a health department report dated November 12, 1981, stated that the sewage filter bed was seeping and directed that repairs be made within 48 hours. Based on reinspections conducted after each of the reports, the Department advised that the defects had been remedied.

The manager hired by Yost to operate the Red Barn testified that he had notified Yost after the November inspection report of the defects cited, and upon telling Yost that the estimated cost to repair the sewage problem, which caused a significant ponding of sewage behind the restaurant, was from $8,000 to $10,000, Yost had replied that a similar job had been done within the past year and directed him to examine the warranty. The manager, however, never did so, but instead undertook the temporary measure of filling in the pond area; later a reinspection report of November 25, 1981 stated that the problem had been cured.
[3] The element of knowledge is on its face misleading, and requires amplification, as indicated in the cases cited infra.
[4] The purchase and sale agreement form which included the clause containing the warranty was prepared and provided by the broker.