585 So.2d 1000 (1991)
Ronnie ARAD, Richard L. Glatzer and Elliott B. Weinger, Appellants/Cross Appellees,
v.
CADUCEUS SELF INSURANCE FUND, INC., Appellee/Cross Appellant.
No. 90-0968.
District Court of Appeal of Florida, Fourth District.
August 21, 1991.
*1001 Charles M. Auslander and Alice Lash of Fine, Jacobson, Schwartz, Nash, Block & England, Miami, for appellants/cross appellees.
Alan C. Sundberg, Alan F. Wagner, and F. Townsend Hawkes of Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A., Tallahassee, for appellee/cross appellant.
HERSEY, Judge.
A group of physicians formed a self-insurance trust as a means of coping with the escalating cost of professional malpractice insurance. Because of certain matters in controversy some of the physicians later brought an action against the trust, seeking rescission on the basis of fraud, damages for breach of contract, and other relief. The trial court found in favor of the trust on the bulk of these claims and three of the physicians filed this appeal. The issue is whether appellants established a cause of action for fraud in the inducement or for breach of contract and, if so, the measure of their damages.
There are two kinds of medical malpractice insurance coverage: occurrence coverage, which provides coverage for any incident of malpractice which occurs during the policy period, no matter whether the claim is brought during the policy period or after; and claims-made coverage, which provides coverage for any claim that actually is made during the policy period arising out of an incident which actually occurred during the period. Claims-made coverage initially is less expensive than occurrence coverage because the insurer's risk ends when the policy period ends, whereas with occurrence coverage, the insurer is at risk into the future even after the premium-paying period has run. In this way, then, occurrence coverage provides more protection to the insured. The rate structure for occurrence coverage is also more difficult to predict because it involves projection of these incurred but not yet reported (IBNR) claims, presenting a risk of incorrect calculation.
There is a supplemental coverage called "tail coverage" that is available to holders of claims-made policies; it protects them into the future for claims regarding incidents that occurred during the policy period but which were not presented until after the policy expired. As to future claims from incidents arising during the insured period, then, a physician who purchases claims-made with a tail achieves the equivalent of occurrence coverage.
Traditional insurance involves payment of one known premium by the insured in exchange for coverage. Some forms of self-insurance can involve an assessment by which the insuring entity can look to the policyholders for additional premium to cover unexpected losses or keep up needed reserves.
From 1981 to 1983 Caduceus provided the plaintiff physicians occurrence coverage with this assessability feature. Perhaps because of the assessability, the policy said, "All rates and premiums adopted shall be based on recognized insurance principles." This is important with occurrence coverage because of the risk in calculating *1002 premiums to cover the IBNR claims. The Caduceus policy was intended to be fully priced: it was supposed to take into account all known loss exposure when the initial premium calculations were made; assessments were to be made if there were variations in the predicted losses.
Caduceus' board of directors ultimately was responsible for setting premium rates. However, in 1975 the board of trustees had contracted with Physician Management Services (PMS) to provide management; PMS was an outside entity and its employees were not employed by the trust.
In 1980, PMS had an outside actuarial consultant, Tillinghast, Nelson & Warren, review Caduceus' status. Tillinghast prepared a draft report which suggested that Caduceus was not meeting expenses and needs and suggested that Caduceus make an immediate premium increase of 50% on July 1, 1980. It further stated, "We can provide no assurance, however, that such an increase will prove to be adequate." PMS did not inform Caduceus' board of directors of this report, finding it "inconclusive." Caduceus' board of directors continued to set rates without benefit of this information, grossly undervaluing premiums as a result.
During this time and after, PMS sent Caduceus' member physicians letters affirming that Caduceus never had had to make an assessment and that it would not have to do so in the foreseeable future. The board of Caduceus sent a similar message.
In 1982, Caduceus, unhappy with PMS' services, ended their relationship. Caduceus also took on a new board of trustees. James Seigler took over day-to-day operations at Caduceus.
In 1984, Seigler hired Tillinghast to conduct a study for Caduceus. A Tillinghast employee recalled the name "Caduceus," and a search of Tillinghast's files at Seigler's request turned up the 1980 report. Seigler told the board about the report but neither he nor the board informed the insureds.
In 1986, the board finally told the insureds that old management (PMS) had secured the Tillinghast study but had not informed the board of trustees of its results; the trustees had set their rates without this information and the rates turned out to be "way below sound actuarial rates for occurrence coverage." The board then informed the insureds that an assessment was imminent.
The new board asked both Coopers & Lybrand and Tillinghast to conduct independent reviews and determine what assessment was needed. By a second letter the new board informed the insureds that the total needed assessment was $18 million. On a per-physician basis, this meant an immediate $15,000 payment plus additional monies over thirty-six months, including seven per cent interest.
These three plaintiffs/appellants were affected in the following manner: Drs. Weinger and Arad, partners, each had paid a total of $55,000 in premium from 1981-1983. Each was assessed a total of $63,000 for this period, more than 100% of premiums paid. Dr. Glatzer paid a total of $35,000 in premiums for 1981 and 1982; his assessment was $46,000.
Many of the insured physicians were angered by the assessment and brought suit against the fund seeking to rescind their coverage or at least to avoid the assessment on the basis that Caduceus had withheld from them the critical information in the Tillinghast report. There also were counts for breach of contract and fiduciary duty.
The trial court entered partial summary judgment for plaintiffs on the first three elements of their rescission count. It found that PMS concealed the Tillinghast report while in the scope and course of its employment by Caduceus. It was acting solely as Caduceus' agent and not as the physicians' agent. Its acts were Caduceus', and Caduceus therefore had made a material misrepresentation or omission. At this stage, all that was left was the question of whether the doctors had detrimentally relied on the representations or omissions.
*1003 The court also granted final summary judgment to Caduceus on Counts II, III, and V because the physicians had not exhausted their administrative remedies before bringing suit. Plaintiffs appealed this issue. This court dismissed the appeal, finding that the issues raised were legally interrelated with the claims still pending before the circuit court and review at that juncture was inappropriate. Gassner v. Caduceus Self-Ins. Fund, Inc., 532 So.2d 1133 (Fla. 4th DCA 1988). This is now an issue of the present appeal.
Eventually, a large number of the physicians settled with Caduceus; several refiled. Some of these plaintiffs then settled as well, leaving the three appellants here as the remaining plaintiffs. By agreement, the parties in Arad adopted the Gassner pleadings and judgments and made them a part of this case.
The matter came on for bench trial. The testimony critical to this appeal concerned whether the doctors relied to their detriment on the omissions and misstatements regarding the premiums and potential for assessment.
The evidence showed that because of the funding problems, what Caduceus offered was an occurrence policy that could not pay for future-reported claims. In essence, then, what Caduceus provided was a claims-made policy with a very expensive tail.
The court entered a final judgment for appellee, insurer, which required appellants to pay the fund a portion of the original assessments. Appellants filed a timely notice of appeal; the fund filed a cross appeal seeking an order compelling the appellants to pay the full assessment.
Appellants argue that they proved their fraud claim and that the trial court should have rescinded the policies. Appellee maintains that the trial court found that appellants' case failed at the fourth stage of the misrepresentation claim in that they did not prove that they detrimentally relied on Caduceus' representations and the omission of the Tillinghast report.
We find error and reverse.
Dr. Weinger testified that it was "extremely important to him" that he believed Caduceus was setting its premiums based on recognized insurance principles in such a way that an assessment was unlikely. He also testified that he renewed based on representations of the health of the plan. Based on its risk pool and the slightly lower rates, Weinger thought Caduceus to be comparable to or more desirable than the occurrence coverage offered by South Broward Hospital District Trust Fund. He also stated that he would not have renewed his policy in those years if he had known of the report because it was clear the fund was not setting rates properly and "may have shortfalls above and beyond what was anticipated." He said he was quite sure he would have insured with South Broward Trust if he had not insured with Caduceus.
Dr. Arad testified that he absolutely relied on Caduceus' representation that "premiums will be set by experts in the field of insurance and they would be appropriate to cover whatever potential expenses might be incurred by that company." He relied because "that was the basis for the financial stability of [Caduceus] which in turn reflects on the" premium payments he had to make and potential assessments. He testified that if he had seen the report or known of its contents at the time Caduceus received it and had known Caduceus was not going to follow the recommendations, he would not have continued to be insured with Caduceus because if it was requesting premiums well below what the experts were suggesting, he eventually would have to pay an assessment. He did testify that he was unsure with whom he would have insured had he not insured with Caduceus, but this does not diminish his claim that he would not have insured with Caduceus.
Dr. Glatzer testified that had he known about the report in 1981, 1982, and 1983, he would have discontinued his policy as soon as he learned of the report because he would have found the premiums were more than his patients could pay in light of the excessive future assessments. He would not have insured with Caduceus in 1981, 1982, and 1983 if he had known of the *1004 report and that Caduceus was not following it.
This testimony constitutes substantial competent evidence that appellants relied to their detriment on the fraudulent misrepresentations; there is not substantial competent evidence to support the contrary view. What the appellants did subsequent to terminating their coverage is not relevant to this determination. It also is not relevant that permitting rescission will adversely impact the remaining members of the trust.
The appropriate remedy for fraud is rescission. Yost v. Rieve Enterprises, Inc., 461 So.2d 178 (Fla. 1st DCA 1984), rev. denied, 469 So.2d 750 (Fla. 1985). We reject each of appellee's suggested grounds for not permitting rescission here as inapplicable or inappropriate.
We also note that appellants have substantiated a cause of action for breach of contract. Caduceus simply did not provide the product appellants bargained and paid for. The breach was willful, consisting of an intentional withholding of crucial information by the agent, PMS.
We come, then, to the question of damages. This appears to be a matter of first impression in this jurisdiction and there is little guidance even from the law of foreign jurisdictions. When rescinding a contract, the parties are to be restored to their original positions. The initial question is whether appellants must compensate Caduceus for the cost of the insurance for the time that Caduceus carried them. The cost of insurance is not simply the cost of a claim; rather, there are administrative expenses regardless of claims experience and these are loaded into the premium calculation. If a policy is rescinded and the insured is not made to pay for the coverage he has gotten during the interim period, then he ends up with the value of the insurance without cost. On the other hand, the policy is being rescinded here because of the fraudulent inducement by the insurer and it "is a fundamental principle of equity that no one shall be permitted to profit from his own fraud... ." Yost, 461 So.2d at 184.
Most of appellee's cases are distinguishable because they did not involve fraud in the inducement, which is a very different matter from a wrongful action taken within the context of performing the agreement. Others are distinguishable because they involved an actual statute prescribing that in the event of repudiation both parties are to be restored to their original circumstance. There is one case, however, that does seem to indicate that the better principle is to require payment of the carrying expenses even where rescission is due to fraud in the inducement, although admittedly it looks to these other cases for authority: Albertus v. ICOA Life Ins. Co., 247 Or. 618, 431 P.2d 264 (1967). The bottom line of all these cases is that insurance protection cannot be returned to the insurer, so to restore the insurer to its original position, the insured should pay the value of the coverage.
Appellants cite cases from other jurisdictions for the opposite view. E.g., Dreiling v. Home State Life Ins. Co., 213 Kan. 137, 515 P.2d 757 (1973). These are life insurance cases. They hold, as the Yost court did in a non-insurance context, that it is not acceptable to allow a defrauder to benefit from his fraud. Appellee attempts to distinguish these cases, pointing out that life insurance is somehow different because an insured gets no benefit if he does not die, whereas there are benefits with casualty insurance, even where no claims are made.
Appellee maintains that appellants received intangible benefits in that the insurance protection allowed them to have staff privileges at hospitals and brought them financial security. But there are intangibles that are afforded one who has life insurance protection as well. For example, it is much easier to secure credit or a loan if one has a life insurance estate. There are other intangibles as well. Therefore, we are not persuaded that appellants' cases have no value simply because they involve life insurance.
We adopt a middle ground. Appellants entered into a contract for certain *1005 insurance protection for which they paid a fixed premium. If the representations upon which they relied had been true, that would most likely have been the extent of their cost for insurance during the years in question. That is, had the premiums actually been based upon sound insurance principles there would have been no need (absent an extraordinarily poor claims experience) for assessments. By the same token those premiums would have represented the exact cost to Caduceus of providing the coverage. It seems reasonable to leave the parties in that posture. Appellants receive the benefit of their bargain and Caduceus is not permitted to profit from the fraud perpetrated by its agent. We so hold.
As to Points I and II on appeal, we reverse and remand with instructions to enter a judgment of rescission with no further payments to be made by appellants. As to the remaining points on appeal and cross appeal, to the extent not previously disposed of, we affirm.
AFFIRMED IN PART; REVERSED IN PART; REMANDED.
POLEN, J., and WALDEN, JAMES H., Senior Judge, concur.