In re Darrin B. FELSNER, Debtor.

Sheila Solomon, Trustee, Appellant,

v.

Michelle Middleton and Robert Fellmy, Appellees.

Civ.No. 06–13992–DT.
Bankruptcy No. 02–71116–SWR.
Adversary No. 04–5142–SWR.

United States District Court,
E.D. Michigan,
Southern Division.

Jan. 18, 2007.

Marshall D. Schultz, Southfield, MI, for Debtor.

**OPINION AND ORDER REVERSING THE BANKRUPTCY COURT'S "ORDER REGARDING CROSS MOTIONS FOR SUMMARY JUDGMENT" AND REMANDING FOR ENTRY OF JUDGMENT FOR APPELLANT**

CLELAND, District Judge.

In this case, Appellees Michelle Middleton and Robert Fellmy resisted the Trustee's attempt to avoid a certain transfer by petitioning the bankruptcy court to judicially sanction a deceptive, and possibly felonious, real estate purchase plan in which Middleton and Debtor Darrin Felsner engaged. The bankruptcy court

agreed with Appellees in an August 22, 2006 "Order Regarding Cross Motions for Summary Judgment" and Appellant Trustee timely filed her "Notice of Appeal" on September 5, 2006.

Middleton was the beneficiary of the deception she perpetrated on a lender in the course of the purchase by Felsner, and subsequent transfer to her, of certain real estate in Florida. The misrepresentation arose from his use of her money-he had none-and her use of his good credit-hers was poor-while falsely asserting that down payment money had been irrevocably gifted to Felsner.

The court has reviewed the record and the briefs in this matter and heard argument on the motion on January 10, 2007. For the reasons stated below, this court will enforce the terms of the gift letter Middleton falsely signed as she cannot now equitably deny its impact. The bankruptcy court's judgment was error, and will be reversed.

## I. JURISDICTION AND STANDARD OF REVIEW

### A. Jurisdiction

On August 22, 2006, the United States Bankruptcy Court for the Eastern District of Michigan granted Appellees' motion for summary judgment and denied Appellant's motion for summary judgment. The parties agree that Appellant filed a timely notice of appeal pursuant to Bankruptcy Rule 8004, and this court has jurisdiction over Appellant's appeal of the August 22, 2006 order pursuant to 28 U.S.C. § 158(a).

Under 28 U.S.C. § 158, the court has jurisdiction over appeals from final orders of the bankruptcy court. Specifically, 28 U.S.C. § 158 states in relevant part:

(a) The district courts of the United States shall have jurisdiction to hear appeals

(1) from final judgments, orders, and decrees;

.　　.　　.　　.　　.

(3) with leave of the court, from other interlocutory orders and decrees; of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under section 157 of this title.

28 U.S.C. § 158(a).

■ A final order of a bankruptcy court may be appealed as of right under § 158(a)(1). *Belfance v. Black River Petroleum, Inc. (In re Hess)*, 209 B.R. 79, 80 (6th Cir. BAP 1997).

### B. Standard of Review

■ In reviewing a bankruptcy appeal, the district court must accept as correct the bankruptcy court's findings of fact, unless they are clearly erroneous. Fed. Rules Bankr.Proc. R. 8013; *see also In re Caldwell*, 851 F.2d 852, 857 (6th Cir.1988). The bankruptcy judge's conclusions of law, however, are reviewed *de novo. Id.* at 857; *Heights Cmty. Congress v. Hilltop Realty, Inc.*, 774 F.2d 135, 140 (6th Cir. 1985). An order granting summary judgment is such a question of law to be reviewed *de novo. Myers v. IRS (In re Myers)*, 216 B.R. 402 (6th Cir. BAP 1998); *In re Batie*, 995 F.2d 85, 88 (6th Cir.1993). The court therefore reviews the bankruptcy court's August 22, 2006 order denying Appellant's and granting Appellees' motion for summary judgment *de novo.*

Federal Rule of Civil Procedure 56, which governs summary judgment motions, provides, in part, that:

[t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the

moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). The moving party has the burden of demonstrating that there is no genuine issue as to any material fact, and summary judgment is to be entered if the evidence is such that a reasonable jury could find only for the moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

"[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 250, 106 S.Ct. 2505. In assessing a summary judgment motion, the court must examine any pleadings, depositions, answers to interrogatories, admissions, and affidavits in a light that is most favorable to the nonmoving party. Fed.R.Civ.P. 56(c); *see United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962).

## II. BACKGROUND

The facts involved in this dispute are uncontested. In early 2001, Felsner and Middleton, who resided together in Middleton's home in Mt. Clemens, Michigan, decided to move to Florida. (Felsner Dep., Appellees' Ex. A.) Accordingly, Middleton sold her Michigan home for $175,000 on July 18, 2001, receiving $137,221.40 in net proceeds. (Middleton Aff. at ¶ 2, Appellees' Ex. C.) In her affidavit, Middleton affirmed that she sold her Michigan home with the "intent to use the sale proceeds for a portion of the price of a new home in Florida." (*Id.*) Due to her bad credit, Middleton was not able to secure a mortgage for the Florida property (the "Property") she wished to purchase. (*Id.* at ¶ 4.) Middleton and Felsner sought financing as co-owners of the Property, but were refused. (Felsner Dep. at 26, Appel-

lees' Ex. A.) Felsner, on the other hand, did have sufficient credit to obtain a mortgage for the home in his name alone. (Middleton Aff. at ¶ 5, Appellee's Ex. C.)

Middleton and Felsner testified that to enable Middleton to acquire the Property despite her bad credit, they accepted the suggestion of a real estate agent that Middleton utilize a "gift letter," transferring the proceeds of her home to Felsner, who would use it as a down payment to buy the Property in his name alone. He would subsequently quit-claim the property to Middleton. (*Id.*) Middleton and Felsner signed the gift letter to effectuate the real estate agent's plan. (*Id.*) Felsner admitted that, to his knowledge, his real estate agent did not inform the mortgage company about their plan to use his credit to purchase the Property on Middleton's behalf. (Felsner Dep. at 43, Appellees' Ex. A.) Felsner further admitted that he did not tell the mortgage company of his intention to immediately quit claim the deed to Middleton, despite his knowledge that the mortgage contract stated the property subject to mortgage was not transferrable. (*Id.*) Felsner agreed with the statement that their plan "was basically this wonderful idea to coerce the mortgage company to give [me] the mortgage to buy the piece of property because with [Middleton] on it [we] weren't going to get the deal done." (*Id.* at 45.)

Consistent with their plan, Felsner represented to the mortgage company at the closing that the $90,000 down payment was gifted to him by Middleton. (*Id.* at 59.) The gift letter, a preprinted form generally consistent with standard gift letter forms used throughout the mortgage industry, indicated that the money was to be made payable directly to the title company, recited that Middleton would give Felsner $90,000 towards the purchase of the Property, and the gift "will be given in good

faith and repayment of such gift is not required to be paid back [sic]." (Gift Letter, Appellant's Ex. I.) Middleton's and Felsner's signatures on the letter appear directly under a "Warning" section, which states that

Section 1010 of Title 18, U.S.C. "Department of Housing and Urban Development transactions", provides "whoever for the purpose of influencing in any way the action of such department ... makes, passes, alters, or publishes any statement, knowing the same to be false shall be fined not more than $5,000.00 or imprisoned not more than 2 years or both."

(*Id.*) Both the real estate agent and the representative of the title company, which was the closing agent, were present and, according to Middleton and Felsner, were both aware of the "straw man" false-purchase arrangement. (Felsner Dep. at 61, Appellees' Ex. A.)

Two days after the closing, Felsner went to the bank and signed the quit claim deed that transferred the Property to Middleton. (*Id.* at 67.) The quit claim deed recites that Felsner "received" $90,589.59 in consideration for transferring the interest to Middleton. (Quitclaim Deed, Appellees' Ex. J.) In reality, however, according to Felsner's testimony, he received nothing in return for transferring the Property to Middleton via quit claim deed. (Felsner Dep. at 27, 60, Appellees' Ex. A.) Felsner agreed that he "believed that [his] purchase of the property and conveyance back to [Middleton] was simply an accommodation to her so that she could buy this house given her credit condition," (*id.* at 61) and that his role was the straw man in the transaction, (*id.* at 62).

Although Felsner and Middleton's relationship soured and they both moved back

to Michigan independently soon thereafter, the Property remained in Felsner's name for a year and a half. The Property was rented, and Middleton did not file the quit claim deed until September 6, 2002, concurrent with the time it was to be transferred to her father. (*Id.* at 50.) In the meanwhile, Felsner had paid the mortgage out of the rental income the Property produced. (*Id.* at 35–36.) When Middleton evicted the tenants, the income stream stopped. (*Id.* at 34.) Felsner was unable to continue paying the mortgage, and filed a Chapter 13 bankruptcy petition. (*Id.*) To avoid foreclosure, Fellmy, Middleton's father, assumed the mortgage in September 2002, and currently owns the Property. (*Id.* at 33–34, 69.) Felsner received verbal confirmation from the mortgage company that he was no longer obligated to them under the mortgage. (*Id.* at 57.)

Felsner filed for Chapter 7 relief on December 20, 2002. Appellant commenced an adversary proceeding under 11 U.S.C. § 544(b) to avoid the transfer of the Property on the grounds that it was fraudulently transferred under Florida Statute § 726.105. Appellant now appeals the bankruptcy court's order denying Appellant's motion for summary judgment and granting Appellees' motion for summary judgment.

## III. DISCUSSION

Appellant seeks to avoid Felsner's transfer of the Property to Middleton, and Middleton's subsequent transfer of the Property to Fellmy. Appellees do not contest the trustee's authority to avoid fraudulent transfers. Appellant contends that the transfer via quit claim deed was fraudulent under Florida law.[1] The relevant section of Florida law provides:

---

1. Appellees do not appear to contest Appellant's assertion that Florida law governs the

disputed transfer. Nonetheless, even if Michigan law would apply, its *Uniform Fraudulent*

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(a) With actual intent to hinder, delay, or defraud any creditor of the debtor; or

(b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

1. Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

2. Intended to incur, or believed or reasonable should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

Fla. Stat. § 726.105(1). Appellant argued below, and maintains here, that when Felsner transferred to Middleton the Property with its approximately $90,000 in equity, he received no consideration in return and violated the Florida fraudulent transfer statute because he became insolvent as a result of the transfer. (Appellant's Summ. J. Mot. at 8.) The bankruptcy court rejected Appellant's argument, finding that Felsner did, in fact, receive consideration of equivalent value in return for transferring the Property to Middleton. (Bankr. Ct. Order at 5, Appellees' Ex. K.) The court appears to have identified the same $90,000 given him by Middleton as that consideration, accepting Appellees' argument that, despite the language of the gift letter, Middleton did not intend to gratuitously transfer the $90,000 to Felsner.

(*Id.*) The court found that the parties intended "a two-step transaction." (*Id.*) This court agrees that such is what Middleton and Felsner intended, but the transaction will not be permitted to stand.

The only issue the parties contest on appeal is the nature of Middleton's transfer of the $90,000 to Felsner. If Felsner were deemed to have owned the $90,000, with no obligation to repay Middleton, then he violated the fraudulent transfer statute when he deeded the Property to Middleton while receiving nothing in return. Appellees argue that if Felsner were deemed contractually *obligated* to give Middleton property that he did not yet own in "exchange" for the $90,000, then that money would constitute consideration for the intended quit-claim deed. Middleton gave Felsner the money, and with it gave him the ability to create equity in his purchase of the Property. By Appellees' argument, however, there seems to be no difference between the two: the money was hers and so the equity in the Property was equally hers. Nothing else is identified by Appellees that could constitute consideration for Felsner's quit-claim of the Property to her.

It is inescapable in any event that, as a matter of law, the terms of the "gift letter" are enforceable and sufficient to deem Middleton's transfer of money to Felsner gratuitous and final; by the terms of that letter, e.g., Middleton could not have successfully sued to recover the $90,000 had Felsner reneged on the "wonderful idea" and simply kept the money. *See Whidden v. Johnson*, 54 So.2d 40 (Fla.1951) (finding that full, complete and absolute gifts by husband to others before his death could not be recovered by widow); *see also Powell v. Leonard*, 9 Fla. 359, 360 (Fla.1861) (quoting Blackstone's *Commentaries* ) ("A true and proper gift or grant is always

Transfer Act is substantially similar to Flori-    da's. *See* Mich. Comp. Laws § 566.34.

accompanied with delivery of possession, and takes effect immediately ... it is then a gift executed in the donee; and it is not in the donor's power to retract it, though he did it without any consideration or recompense...").

It is also clear, as a matter of fact, that Felsner received absolutely nothing in consideration upon his transfer of the Property to Middleton. His own testimony validates this proposition. There was, for example, no different or additional $90,000 given by Middleton in exchange for the deed as the deed recites. Middleton acquired nothing more than title to the $90,000 equity she herself had earlier provided Felsner by gift, and paid nothing for it. Felsner had nothing at the start and was left with nothing at the end. In reality, there were three events: she gave him money and he gave it back, and between those events there was a purchase of the Property predicated at least in part upon the false gift letter. If there had been real consideration given for the deed, Felsner would have been left with something near $90,000 and would not have been rendered insolvent.

■ A valid gift requires donative intent, actual delivery and acceptance. *Davidson v. Bugbee*, 227 Mich.App. 264, 575 N.W.2d 574, 576 (1997); *Green v. Green*, 314 So.2d 801, 802 (Fla.Ct.App. 1975). Appellees do not debate that the $90,000 was delivered nor that it was accepted. Middleton's statement in the gift letter under penalty of § 1010 unambiguously confirms donative intent at the time of the transfer.

Middleton and Felsner argue, contrary to the terms of the letter, that there was no donative intent because Middleton transferred the money to Felsner simply to execute their idea to get the Property into Middleton's hands. (Felsner Dep. at 45, Appellee's Ex. A.) Appellees, of course,

cannot and do not dispute Middleton's and Felsner's signature on the gift letter, nor the letter's clear recitation of Middleton's donative intent with no expectation of repayment. (Gift Letter, Appellant's Ex. I.) Middleton and Felsner clearly represented in writing to the world that this money was a gift.

■ In defending against the Trustee's avoidance, asking this court to release them from the unambiguous terms of the letter and to correspondingly imply a contractual obligation on Felsner's part to transfer the Property to Middleton, Appellees seek equitable relief. *See Bond v. Hewitt*, 111 Fla. 180, 149 So. 606, 609 (1933) (citing *Capital City Bank v. Hilson*, 64 Fla. 206, 60 So. 189 (1912)) ("A written contract cannot be reformed in an action at law. A court of equity must be resorted to for that purpose."); *Ganaway v. Henderson*, 103 So.2d 693, 699 (Fla.Dist. Ct.App.1958) ("[I]t is elemental that the remedy of cancellation or rescission of a written instrument by operation of law is available only in a court of equity...."). Appellees are due such equitable relief, however, only if they "come in [to court] with clean hands." *Rose v. The National Auction Group, Inc.*, 466 Mich. 453, 646 N.W.2d 455, 461 (2002) (citations omitted); *see also Yost v. Rieve Enter., Inc.*, 461 So.2d 178, 184 (Fla.Ct.App.1984) (citations omitted) ("it is a fundamental principle of equity that no one shall be permitted to profit from his own fraud or wrongdoing, and that one who seeks the aid of equity must do so with clean hands.").

Middleton's sworn affidavit and Felsner's sworn testimony directly contradict and disavow the truth of the written statement they made subject to the penalties of 18 U.S.C. § 1010 that the $90,000 was a gift not required to be paid back. If their intent was to materially influence HUD and/or FHA consideration, their testimony

would constitute fairly well-rounded admissions on their part that they committed fraud in violation of § 1010.[2] At oral argument, however, the parties agreed that the financing was through a conventional lender. Accordingly, a § 1010 fraud appears not to have been committed here.

Despite that, the false gift letter was signed as part of Middleton and Felsner's plan to trick the traditional lender-or in Felsner's felicitous phrase, to "coerce" the lender-into approving a mortgage that would, in practice, obligate Middleton and Felsner jointly. This was a proposition that Middleton and Felsner knew the lender had previously rejected due to Middleton's poor credit rating. As noted, Middleton and Felsner's actions did not constitute § 1010 fraud. They may, however, have constituted the more serious crime of bank fraud in violation of 18 U.S.C. § 1344, even if it were true that the real estate broker suggested the gift letter ploy[3] or a repre-sentative of the lender had knowledge of its falsity.[4] The court emphatically disagrees with Appellee's counsel's argument that Middleton's statement in the gift letter was "not dishonest." Even if it does not specifically fit within either of the above criminal statutes, the plan to mislead by executing a falsely-stated gift letter constitutes, at the least, palpable wrongdoing in a generic sense, and as such precludes Middleton from claiming that she comes before the court with clean hands.

"The clean hands doctrine has been applied to deny equitable relief to parties to a fraudulent contract." *Rose,* 646 N.W.2d at 461; *see also Yost,* 461 So.2d at 184 ("There is no bar to applying the doctrine of unclean hands to a case in which both the plaintiff and the defendant are parties to a fraudulent transaction perpetrated on a third party."). Felsner admitted that he

2. The court is unconvinced by Appellees' argument attempting to distinguish between "the funds" that were transferred and the equity represented by Middleton's gift to Felsner in the Property. Appellees argue that "[t]here was no false statement made by Middleton in the Gift Letter" because "she at no time required Felsner to pay back to her the transferred *funds.*" (Appellees' Resp. Br. at 2–3 (emphasis added).) Just because the transaction involved Felsner repaying the gift in equity, rather than repaying $90,000 in cash, does not mean that Middleton did not anticipate repayment in some form. The "gift letter" spoke of the *gift,* not the "funds," which Appellees misleadingly try to distinguish as though these are separate things.

3. False gift letters are very well-known for the role they play in committing bank fraud in analogous situations. *See, e.g., United States v. Morrow,* 177 F.3d 272, 289 (5th Cir.1999) (affirming sales representatives' convictions for conspiring and aiding and abetting bank fraud in a scheme that used, among other false documents, fraudulent gift letters to obtain financing for the purchase of mobile homes; defendant sales representative's "di-rect[ion] to [purchaser] to submit a falsified gift letter to secure the financing" found sufficient to prove conspiracy to defraud).

4. After a requested recess at argument in order to consult with client, Fellmy, Appellee's counsel averred to the court that an unnamed representative of the mortgage company was also present at the real estate closing and knew about the intended quit-claim of the Property to Middleton. Counsel admitted, however, that he knew of no factual support in the record for that assertion. Even assuming that the assertion were supported by evidence, the mere presence of a representative of the mortgage lender—even with the knowledge as apparently alleged by Fellmy—does not negate the falsity of the gift letter. Indeed, such participation may even contribute to a finding of conspiratorial liability on the part of that representative. *See Morrow,* 177 F.3d at 286 (included among many bank fraud defendants was vice-president of a savings bank and a mortgage company, convicted based upon his "far reaching scheme to fraudulently obtain the funds of the Bank" by instructing others to "falsely complete various financing forms").

 

was used as a straw man in Middleton's attempt to deceive the lender. (Felsner Dep. at 45, Appellees' Ex. A.)

Either Middleton is deemed to have truthfully signed the gift letter and gratuitously transferred the funds, in which case Appellant's argument for Felsner's fraudulent transfer is proven, or by a judicial finding in equity she is deemed to have had no donative intent, a finding that of necessity would be based upon her misrepresentation-perhaps felonious-in knowingly signing the false letter in order to execute a plan to deceive. The bankruptcy court seems to have ignored the written statement Middleton made under penalty of law and relied instead on Middleton and Felsner's admitted plan to "coerce" the lender. Courts, however, should not impute legitimacy to a deceptive transaction in aid of the person who perpetrated the deception. In doing so the bankruptcy court clearly erred.

 Accordingly, the court holds, as a matter of law, that after Middleton delivered the $90,000 to Felsner, it is properly deemed gifted irrevocably and belonging to him. As such, Felsner owed Middleton nothing, certainly no obligation to repay. When Felsner quit-claimed to Middleton the Property, with its approximately $90,000 in equity, he made an equivalent "gift" to her, and received nothing in consideration. In doing so he believed, or reasonably should have believed, that he would incur debts beyond his ability to pay as they became due. He was left insolvent and the transfer was accordingly fraudulent. *See* Fla. Stat. § 726.105(1)(b)(2). Appellees argue that Felsner was also insolvent before Middleton gifted the $90,000, but while true, that observation does not alter the fact that he was solvent upon receiving her gift.

Finally, the court firmly disagrees that a "[m]iscarriage of justice would occur if

Middleton was forced to pay $90,000.00 to Appellant." (Appellees' Resp. Br. at 9.) To accept Appellees' argument would be to sanction this wrongful arrangement from the bench, soiling the court's hands in the process, and perpetrating a true miscarriage of justice by allowing Middleton to enjoy the fruits of the plan that she orchestrated-or at least willingly participated in-to intentionally and materially deceive (or perhaps "coerce") the lender.

## IV. CONCLUSION

For the reasons stated above, IT IS ORDERED that the bankruptcy court's August 22, 2006 "Order Regarding Cross Motions for Summary Judgment" is REVERSED, and this case is REMANDED for an entry of judgment for Appellant.