**In re SARASOTA PLAZA ASSOCIATES LTD. PARTNERSHIP, Debtor.**

**SARASOTA PLAZA ASSOCIATES LTD. PARTNERSHIP, Plaintiff,**

v.

**Barry TRUPIN, Defendant.**

**Bankruptcy No. 89–0061–8P1.
Adv. No. 89–151.**

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

April 6, 1992.

Michael L. Ingram, Tampa, Fla., for debtor/plaintiff.

Barry Trupin, pro se.

Sara Kistler, Asst. U.S. Trustee.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND MEMORANDUM OPINION

ALEXANDER L. PASKAY, Chief Judge.

THIS IS a confirmed Chapter 11 case and the matter under consideration is a five-Count Complaint filed by Sarasota Plaza Associates Ltd. Partnership (Debtor) originally against several Defendants, all of whom have been previously dismissed with the exception of Barry Trupin (Trupin). The Debtor's Second Amended Complaint set forth the following claims. The claim in Count I is based on an alleged fraudulent transfer, the claim in Count II is based on money loaned, the claim in Count III is based on conversion, the claim in Count IV is based on civil theft, and the claim in Count V is based on a fraudulent misrepresentation.

At the commencement of the trial, the Debtor voluntarily dismissed the claim set forth in Count I which was based on an alleged fraudulent transfer. Thus, the trial proceeded against Trupin on the claims set forth in Counts II, III, IV and V. The facts as established at the trial which are relevant to the claims under consideration are as follows:

Barry Trupin was a syndicator of tax shelter equipment leases who moved into real estate syndication in 1984. The Debtor was the first of several of Trupin's real estate syndications. In July, 1984, Trupin formed Whitehall Associates Limited Partnerships (Whitehall), which was owned and controlled by the "MHT group of companies" (MHT). MHT, in turn, was wholly owned by the Tara Jill Trupin 1983A Trust (1983A Trust). The sole beneficiary of the Trust was Trupin's daughter, and the trustee was Trupin's father, Bennett Trupin. MHT was comprised of some 50 to 60 Trupin-controlled companies, all of which operated out of Trupin's business office in New York City.

On September 14, 1984, Whitehall purchased the United First Federal Building (Building) from United First Federal for $15,200,000. At the time of the purchase, a Private Placement Memorandum was circu-

lated among potential investors offering units in a limited partnership to be formed for the sole purpose of owning the Building. According to the Private Placement Memorandum, there were several entities involved in the syndication. Rothschild Registry Management Corp. (Registry Management) was designated as general partner; Rothschild Registry International, Inc. (Registry International) was designated as the placement agent; and Rothschild Registry Properties Corp. (Registry Properties) was designated as managing agent. The Private Placement Memorandum named Peter Prowant as president of both Registry Management and Registry International, and named Marvin Schaffer as executive vice president of Registry International. Marvin Schaffer was a childhood friend of Trupin.

The three Rothschild corporations were owned by a company called Rothschild Registry Holding Corp. (Holding). The officers and directors of Holding—Peter Prowant, his brother John Prowant, Marvin Schaffer, and Jerry Sager—were officers or employees of Registry International when it was a wholly-owned subsidiary of another Trupin-controlled entity, Rothschild Reserve (Reserve).

In October, 1984, 160 investors purchased units in Sarasota Plaza Associates Limited Partnership, signed limited partnership agreements, paid $1,835 in cash, and executed negotiable promissory notes for $99,763 per unit. On October 31, 1984, Whitehall sold the Building which it had purchased for $15,200,000 to an entity named Conrad Realty for $22,400,000, generating a profit of $7,200,000 after holding the property for only six weeks. Conrad Realty was formed for the sole purpose of rendering services to the Trupin-controlled MHT group of companies, and Conrad Realty earned 100 percent of its income from MHT. On the same day as it purchased the Building, Conrad Realty sold the building to the Debtor for $22,763,000. There is some evidence that at that time, the value of the property was approximately $14,600,000.

In October and December of 1984, the promissory notes given to the Debtor as payment for the limited partnership units were negotiated through a series of assignments to Registry Properties. The notes were then sold to a firm that buys and sells investor notes. Payments totalling $10,614,249.94 were made by the Debtor to Registry Properties for the notes. Out of those funds, $7,414,067.90 was wire-transferred to Conrad Realty, which then wire-transferred $7,264,067.90 to Whitehall. Another $1,590,156.25 was wire-transferred to Conrad Realty, which in turn wire-transferred $1,690,156.25 to Whitehall.

In February, 1985, Trupin became a limited partner in the venture, substituting for three former limited partners, and executed a promissory note for $432,418.50. In mid-to-late 1985, Trupin became an officer or director of the general partner of the Debtor. From October, 1985 through October, 1986, numerous payments were made by the Debtor to Registry Properties and to Registry International. These payments were characterized by the Debtor as "loans," and they totalled $3,136,850. In each case, the money received by Sarasota Management Corp. was immediately transferred to Reserve. Reserve was an entity which was owned by the Tara Jill Trupin 1980 Trust (1980 Trust), whose trustee was Barry Trupin and whose sole beneficiary was Trupin's daughter.

These are the facts based upon which the Debtor has filed the five-Count Complaint, only four Counts of which were tried against Trupin. As noted earlier, Count I of the Debtor's Complaint based on an alleged fraudulent transfer was voluntarily dismissed by the Debtor before the trial. This leaves for consideration Counts II through V of the Debtor's Complaint.

Count II of the Debtor's Complaint, the Count for money loaned, is based on the Debtor's contention that "loans" totalling $3,136,850 were made by the Debtor to entities controlled by Trupin. The validity of this claim set forth in this Count is not free from serious doubt for this reason. There is nothing in this record to support the conclusion that the Debtor

loaned money to Trupin personally. The fact that unauthenticated corporate records indicate that after a series of transfers, funds went from the Debtor to entities in which Trupin had an involvement falls woefully short of meeting the burden of proof needed to establish a claim for money loaned. The Debtor introduced voluminous corporate records at the trial to document the transfers of funds, however, none of these corporate records are admissible as competent evidence for the simple reason that the Debtor failed to introduce these records through a person with personal knowledge of these books and records and who had custody and control of these records or otherwise satisfied the requirement of the so-called Shop Book Rule. Fed.R.Evid. 803(6) as adopted by Bankruptcy Rule 9017. In sum, the only evidence to meet the allegations that the Debtor loaned funds which ultimately were received by Trupin but were not repaid, was not established by competent evidence. Accordingly, this Court is satisfied that the claim in Count II of the Debtor's Complaint has not been proven with the requisite degree of proof and, therefore, should be dismissed.

■ The claims in Counts III and IV of the Complaint are based on conversion and civil theft and can be treated together. At common law, a cause of action for conversion consists of an unauthorized act which deprives another of his property permanently or for an indefinite time. *Senfeld v. Bank of Nova Scotia Trust Co.*, 450 So.2d 1157 (Fla. 3d DCA 1985); *Star Fruit Co. v. Eagle Lake Growers, Inc.*, 160 Fla. 130, 33 So.2d 858 (1948); *National Union Fire Ins. Co. of Pennsylvania v. Carib Aviation, Inc.*, 759 F.2d 873 (11th Cir.1985). In a similar vein, § 812.014(1), *Fla.Stat.*, provides as follows:

A person is guilty of theft if he knowingly obtains or uses or endeavors to obtain or to use, the property of another with intent to either temporarily or permanently:

(a) Deprive the other person of a right to the property or a benefit therefrom.

(b) Appropriate the property to his own use or the use of any person not entitled thereto.

■ In support of the claims in Counts III and IV, the Debtor points to a series of transfers of funds from the Debtor to various entities purportedly controlled by Trupin. While there is some evidence in this record of transfers of funds from the Debtor to entities controlled by Trupin, in only one instance were funds ever transferred to Trupin's personal account. However, there is evidence in the record to support the finding that the funds received by Trupin were immediately transferred back out of Trupin's account. Def. Exh. # 2. In sum, the evidence only proves that the funds were transferred several times and ultimately were temporarily deposited into Trupin's account, and this evidence falls short of proving a claim for either civil theft or conversion. It is evident that unless the Debtor can pierce the corporate veil between Trupin and the several corporations purportedly controlled by him, there is nothing in this record which would support a claim for conversion or civil theft simply because funds were transferred to corporations with which Trupin had some connection. In this connection, it should be noted that the Debtor made little effort to pierce the corporate veil between corporations in which Trupin was involved and Trupin.

This leaves for consideration Count V of the Debtor's Complaint, a claim for fraudulent misrepresentation. In support of the claim for fraudulent misrepresentation, the Debtor contends that Trupin misrepresented the value of the building which was sold by Conrad Realty to the Debtor for $22,763,000, and which resulted in a profit of $7,563,000 for entities controlled by Trupin. It is well-settled in Florida that the essential elements of a claim for fraudulent misrepresentation are i) a false statement of fact by the defendant, ii) knowledge by the defendant that the statement of fact was false at the time it was made, iii) intent by the defendant that the statement of fact induce another to act in reliance thereon, and iv) actual reliance on the statement of fact resulting in damage. *Spitz v. Pru-*

*dential–Bache Securities,* 549 So.2d 777 (Fla. 4th DCA 1989); *W.F. Yost v. Rieve Enterprises, Inc.,* 461 So.2d 178 (Fla. 1st DCA 1984).

■ The Debtor in this case failed to prove that there was any representation that the fair market value of the building was $22,763,000. While it is true that the Private Placement Memorandum which was circulated stated that this was the purchase price of the building paid by the Debtor, this is all that the Private Placement Memorandum stated. There is simply no representation in the Private Placement Memorandum that the fair market value of the building was $22,763,000. In short, the Debtor's failure to prove that Trupin made a materially false statement regarding the value of the property on which the Debtor reasonably relied, means that the Debtor's claim for fraudulent misrepresentation must fail since it is axiomatic that there can be no fraud where there is no false statement of fact. Further, this Court finds that the sale of the building was between equally sophisticated parties, and the Debtor is simply complaining of what it now considers to be a "bad deal." In sum, this Court is satisfied that the Debtor's claim for fraudulent misrepresentation is not well taken and should be dismissed.

Accordingly, it is

ORDERED, ADJUDGED AND DECREED that Count I of the Plaintiff's Complaint which the Plaintiff voluntarily dismissed is dismissed. It is further

ORDERED, ADJUDGED AND DECREED that Count II, III, IV, and V of the Plaintiff's Complaint are also dismissed. A separate Final Judgment will be entered in accordance with the foregoing.

DONE AND ORDERED.