**Michigan Supreme Court**
**Lansing, Michigan 48909**

# Opinion

Chief Justice
Maura D. Corrigan

Justices
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Clifford W. Taylor
Robert P. Young, Jr.
Stephen J. Markman

**FILED JULY 9, 2002**

GEORGE ROSE and FRANCES ROSE,

    Plaintiffs-Appellees,

v

    No. 116600

THE NATIONAL AUCTION GROUP, INC,
ANDREW BONE, WILLIAM BONE, DONALD
BOOZER, EDDIE HAYNES and EDDIE
HAYNES, INC.,

    Defendants-Appellants,

and

RANDALL R. HALL,

    Defendant.

_____

BEFORE THE ENTIRE BENCH

TAYLOR, J.

    This case arises from the auction of an island formerly owned by plaintiffs. In short, plaintiffs contend that defendants induced plaintiffs, by fraud and misrepresentation, into surrendering their contractual right to withdraw the

property from the auction by offering and agreeing to use a false or "shill" bidder at the auction and, thus, plaintiffs should not have to honor their earlier negotiated contract with defendants. The trial court granted summary disposition in favor of defendants on all claims. The Court of Appeals reversed the judgment of the trial court, holding that some of plaintiffs' claims should go forward. Unpublished opinion per curiam, issued March 7, 2000 (Docket No. 210666). We disagree and reverse the judgment of the Court of Appeals in part. In particular, this case implicates the "clean hands" doctrine in light of plaintiff George Rose's acknowledged agreement to engage in an illicit shill bidder scheme.

I

Plaintiffs George and Frances Rose owned an island in Lake Huron, known as "Crooked Island," which they had decided to sell. Mr. Rose approached defendant National Auction Group (NAG) through its agent Andrew Bone about selling the island at an auction. There were extended contacts between Mr. Rose and representatives of NAG over the course of approximately one year. Mr. Rose periodically had legal counsel in these discussions. At one point, William Bone, another of NAG's agents, met with Mr. Rose at the island, discussed NAG's experiences in selling Lake Huron island property, and told Mr. Rose that it would be no problem to obtain Mr. Rose's

2

desired price of $850,000 for the island.[1]  To gain familiarity with NAG's approaches to the auction process, during the course of this year, at NAG's invitation, plaintiff attended four Michigan property auctions conducted by NAG.

Plaintiffs thereafter signed a one-year listing agreement with NAG on July 11, 1996.  This agreement expressly provided that the island was to be sold at an auction with no guaranteed minimum selling price, a circumstance that is also described as an absolute auction with no reserve.  The agreement stated:

> The National Auction Group, Inc. will sell the Property at absolute auction with no minimums or reserves.  The Property will be sold to the highest bidder(s) regardless of the bid price and Seller understands and acknowledges that he relinquishes any right to place any minimum or reserve on the bidding with respect to the property.[2]

The agreement qualified this submission to auction by providing that Mr. Rose "has [the] right to withdraw property

---

[1] Our recitation of the facts either presents such facts as are undisputed or, in case of a dispute, attempts to present the disputed matters in a light favorable to plaintiffs.  We use this approach because in reviewing a decision on a motion for summary disposition brought by defendants, we are required to consider the factual record in a light most favorable to plaintiffs. *Quinto v Cross & Peters Co,* 451 Mich 358, 362; 547 NW2d 314 (1996).  We also note that all the individual defendants who are parties to this appeal were apparently employees or other agents of NAG.

[2] Notably, an alternative paragraph in the form used to draft the contract that contemplated the possibility of a seller setting a "reserve" or minimum selling price for the auction was crossed-out.

3

prior to auction."  As to any guarantee concerning the ultimate selling price, the agreement included an acknowledgment that NAG "has made no representations or promises as to the price that may be bid at the auction and . . . has in fact stated it has no opinion as to the value of the property or of the price it will bring at the auction sale."  Finally, the listing agreement at two points included language that specifically precluded oral modifications of the agreement.

Eventually, after the circulation of brochures announcing the auction by NAG (which advertised that the auction would be an "absolute auction," i.e., a "no reserve auction" without any set minimum bid[3]), the contemplated auction was held.  At the auction, Mr. Rose was concerned that only five bidders, including those participating by telephone, had registered, and he indicated to William Bone that he wanted to withdraw the property from the auction as was his right under the agreement.  William Bone, in an attempt to reassure, told Mr. Rose that the auction could go forward, but that he did not need to be concerned that the price would be less than he

---

[3] The cover page of the brochure, which also included listings for the auctioning of other property besides the island presently at issue, was entitled "Absolute Auction." Further, in the part of the brochure with a relatively detailed description of Crooked Island, it was expressly stated, "Selling regardless of price."

4

wanted.    The reason was that if the bidding was too low, a NAG shill would make a phony bid.    Only NAG agents and Mr. Rose would know the bid was not to actually buy the property, but instead to deprive the true high bidder of the property. Notwithstanding the obvious perfidy of this scheme, Mr. Rose agreed to it and, accordingly, the auction proceeded.

As the auction proceeded, bids were few and were stalled at $175,000.    At this point, a recess was called.    Mr. Rose then met with the NAG representatives, saying that $175,000 was unacceptable and that he wanted at least $850,000 for the island.    For their part, the NAG representatives attempted to convince Mr. Rose that $175,000 was a fair bid, but he did not agree and directed NAG to reconvene the bidding and implement the shill bidder scheme.    Once reopened, whether through bungling or yet more chicanery, the promised NAG shill did not enter the bidding and, thus, the bidding closed at $175,000. Mr. Rose was, needless to say, dismayed with this outcome, but did eventually sign a purchase agreement for the sale of the property for $175,000 plus a six percent auction fee to be paid to NAG by the high bidder.[4]    Mr. Rose now seeks to use

---

[4] Mrs. Rose refused to sign the purchase agreement, but the Court of Appeals has held that her refusal did not invalidate the agreement.  The propriety of that ruling is not before us.

the courts to settle the score with his unfaithful confederates.

Plaintiffs filed this suit against NAG and the affiliated individual defendants, essentially seeking reimbursement for the commissions paid to them pursuant to the listing agreement as well as damages to put them in the place they would have been had the shill performed. Plaintiffs alleged two types of claims.[5] The first were "precontract" claims of fraud, misrepresentation, and breach of fiduciary duty covering the time before the execution of the listing agreement. The second were "postcontract" oral claims springing out of the shill scheme agreed to at the auction. These also sounded in fraud, misrepresentation, and breach of fiduciary duty, and asked the trial court to act in equity to void the purchase agreements and to divest NAG of the commission paid to it.

Defendants moved for summary disposition under MCR 2.116(C)(7) and (10). Defendants argued that the alleged precontract representations were not actionable because they were mere "puffing" as was made clear by the fact that the listing agreement, not once, but twice specifically disclaimed that defendants had made any representations concerning the

_____

[5] Plaintiffs also named Randall Hall, the good-faith purchaser of the property, as a defendant. However, Hall's motion for summary disposition was granted, and he was dismissed from the suit. Plaintiffs do not raise any claims with respect to Hall in this appeal.

6

value of the property or the price at which it might sell. Regarding the postcontract claims, defendants argued that any oral agreement alleged by defendants would contravene the "no oral modification" clause of the written agreement as well as the applicable statute of frauds. Defendants further argued that because the use of shill bidders was illegal that plaintiffs should not be able to invoke the court's equity powers to enforce this illegal contract.

The trial court ruled in favor of defendants, holding that with respect to the precontract claims, the express language of the written agreement and the accompanying disclaimer specifically refuted those claims and that the precontract statements allegedly made by defendants "constitute either puffing, mere opinion, or are statements pertaining to future events . . . ." Regarding the postcontract claims, the trial court held that the oral understanding allegedly arrived at by the parties was illegal because it would require the use of false bidders, it would be in violation of the statute of frauds, and it would violate the written agreement that specifically required any changes to be in writing and signed by the parties.

A unanimous Court of Appeals affirmed the trial court regarding the "precontract" claims, but, by a two-to-one vote, reversed regarding the "postcontract" claims. As to the

postcontract claims, the majority essentially concluded that, while the oral agreement contemplating the use of a shill bidder was void as against public policy, this did not necessarily preclude plaintiffs from maintaining an action for fraud or misrepresentation or for negligence or breach of fiduciary duty in order to recover certain types of damages from defendants. The Court further reinstated certain claims by plaintiffs related to defendants' efforts in publicizing and conducting the auction. We granted defendant's application for leave to appeal regarding generally the postcontract issues.

## II

This case arises from the trial court's grant of summary disposition in favor of defendants under MCR 2.116(C)(10). We review this issue de novo. *Maiden v Rozwood,* 461 Mich 109, 118; 597 NW2d 817 (1999). In reviewing such a decision, we consider the affidavits, pleadings, depositions, admissions, and other documentary evidence submitted by the parties in the light most favorable to the party opposing the motion. *Quinto v Cross & Peters Co,* 451 Mich 358, 362; 547 NW2d 314 (1996). Summary disposition under MCR 2.116(C)(10) is appropriately granted if there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law. *Id.*

III

Before us then are the "postcontract" claims. Plaintiffs, in their fraud and misrepresentation claims are seeking, by the invocation of the court's equity powers, to retrospectively revoke their obligations to NAG under the written contract for the holding of the auction. That is, they argue they would have canceled the auction had it not been for the lure of the shill bidder scheme.

Yet, Mr. Rose's reason for not canceling the auction was because he chose to enter into an agreement with NAG to surreptitiously deprive the bidders of the no reserve auction that had been advertised. It cannot be doubted that even those with no business world experience would understand that it is wrong to advertise one thing and then secretly plot to never deliver on the promises. Our law follows this norm as it is undisputed that the use of a "shill" or false bidder unbeknown to the sincere bidders at an auction is contrary to our public policy. Under common-law principles articulated long ago, agreements to stifle competitive bidding are generally contrary to public policy. See *Detroit Trust Co v Agozzinio,* 280 Mich 402, 405; 273 NW 747 (1937); *Leland v Ford,* 245 Mich 599; 223 NW 218 (1929).[6] Given improper

---

[6] To similar effect, see MCL 446.58, wherein the Legislature banned the use of shills in personal property auctions.

conduct by Mr. Rose, plaintiffs' equitable claims of fraud and misrepresentation[7] are barred by the bedrock principle that the preservation of the integrity of the judicial system means no court acting in equity can allow its conscience to be moved to give such a plaintiff relief.  Indeed, the maxim that one "who comes into equity must come with clean hands" is "the expression of one of the elementary and fundamental conceptions of equity jurisprudence."  2 Pomeroy's Equity Jurisprudence, ch I, p 90, § 398, 92 (1941).  The courts of this state have held similarly.  Justice Cooley wrote for a unanimous Court in *Rust v Conrad,* 47 Mich 449, 454; 11 NW 265 (1882):

> [I]f there are any indications of overreaching
> or unfairness on [an equity plaintiff's] part, the
> court will refuse to entertain his case, and turn
> him over to the usual remedies.

Writing even more pointedly and echoing Pomeroy, we have reiterated this rule more recently, stating in a succinct formulation of the doctrine "that one who seeks the aid of equity must come in with clean hands." *Stachnik v Winkel,* 394 Mich 375, 382; 230 NW2d 529 (1975), quoting *Charles E Austin, Inc v Secretary of State,* 321 Mich 426, 435; 32 NW2d 694 (1948).  The *Stachnik* Court aptly described the scope and

---

[7] See *Flood v Welsh,* 334 Mich 583, 591-592; 55 NW2d 104 (1952) (describing the cancellation of an executed contract on the basis of fraud as a power of a court of equity).

purpose of the clean hands doctrine as

> "a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, *however improper may have been the behavior of the defendant.* That doctrine is rooted in the historical concept of the court of equity as a vehicle for affirmatively enforcing the requirements of conscience and good faith. This presupposes a refusal on its part to be 'the abettor of iniquity.' *Bein v Heath,* [47 US] 6 How 228, 247 [12 L Ed 416 (1848)]." *Precision Instrument Manufacturing Co v Automotive Maintenance Machinery Co,* 324 US 806, 814; 65 S Ct 993; 89 L Ed 1381 (1944). [*Id.,* at 382 (emphasis added).]

Further, relevant to the instant case, the clean hands doctrine has been applied to deny equitable relief to parties to a fraudulent contract:

> If a contract has been entered into through fraud, or to accomplish any fraudulent purpose, a court of equity will not, at the suit of one of the fraudulent parties,—a *particeps doli,*—while the agreement is still executory, either compel its execution or decree its cancellation, nor after it has been executed, set it aside, and thus restore the plaintiff to the property or other interests which he had fraudulently transferred. [2 Pomeroy *supra,* § 401, p 105.][8]

---

[8] Unquestionably, the most famous illegal purpose contract case is the legendary and perhaps supposititious "highwayman's case," that generations of law students have trained on. There, one criminal unsuccessfully attempted to invoke equity to sue another for a share of their ill-gotten booty. Our Court in 1956 discussed this case, quoting from Pothier on Obligations, in a fashion that cannot be improved upon, as follows:

> "There is a tradition that a suit was instituted by a highwayman against his companion to account for his share of the plunder, and a copy of

Accordingly, while plaintiffs emphasize the alleged improper behavior of defendants in devising the shill bidder scheme and using it to induce Mr. Rose to continue with the auction, this does not change the fact that plaintiffs are barred as a matter of law by the clean hands doctrine from advancing their equitable claims of fraud and misrepresentation in connection with that scheme.

In concluding that plaintiffs' fraud and misrepresentation claims in connection with the shill bidder scheme were not barred as a matter of law, the Court of Appeals concluded that "an issue of fact exists whether plaintiffs reasonably relied on . . . defendants'

the proceedings has been published as found amongst the papers of a deceased attorney. It was a bill in the Exchequer, which avoided stating in direct terms the criminality of the engagement, and is founded upon a supposed dealing as copartners in rings, watches, et cetera, but the mode of dealing may be manifestly inferred. The tradition receives some degree of authenticity, by the order of the court being such as would in all probability ensue from such an attempt. The order was, that the bill should be dismissed with costs for impertinence, and the solicitor fined 50£. The printed account is accompanied by a memorandum which states the particular times and places where the plaintiff and defendant were afterwards executed." [*Manning v Bishop of Marquette,* 345 Mich 130, 133-134; 76 NW2d 75 (1956), quoting 2 Evans', Pothier on Obligations (3d Am ed), pp 2,3.]

Fortunately for the present parties, Michigan law tends to be far less harsh than the early common law in England.

representations that they would use a false bidder to prevent plaintiffs' property from being sold below their minimum price." In this regard, the Court noted that plaintiffs contended that they were unaware that use of a false bidder was illegal. While acknowledging the general rule that ignorance of the law cannot prevent its enforcement, the Court stated that "when a mistake of law is predicated on an affirmative misrepresentation by one who acts in a fiduciary capacity, the law is more forgiving." The Court quoted the following from *Tompkins v Hollister,* 60 Mich 470, 480; 27 NW 651 (1886), in support of this analysis:

> It is true . . . that mistakes of law cannot usually be a ground of relief, when standing alone. The current of authority runs in that direction most strongly, although in some states even such relief has been granted.

> But it is also true that there are cases of fraudulent misrepresentations or concealments of matters of law by those holding confidential relations to the person wronged thereby which equity will relieve against. Where one relies upon another, *and has a right to so rely,* and the person relied upon omits to state a most material legal consideration within his knowledge, of which the other is ignorant, affecting his rights, and the person thus ignorant acts under this misplaced confidence and is misled by it, a court of equity will afford relief, especially if such action is to the advantage of the person whose advice is taken, even though no fraud was intended[.] [Emphasis added.]

We conclude that, in its consideration of *Tompkins,* the Court of Appeals failed to appropriately consider the

13

emphasized language that allows a claim of fraud or misrepresentation related to a point of law only where the plaintiff "has a right to so rely" on the advice.[9] Stated more plainly, a person cannot avoid the clean hands doctrine by "relying" on advice or inducement to engage in a course of conduct where it is plainly evident that the conduct is illegal or unethical. We note the following from 3 Pomeroy, *supra*, § 891, pp 509-510:

> Any representation, in order that one may be justified in relying upon it, must be, in some degree at least, reasonable; at all events, it must not be so self-contradictory or absurd that no reasonable man could believe it.

Moreover, even underhanded conduct that does not rise to the level of being legally prohibited can nevertheless require application of the clean hands doctrine:

> Misconduct which will bar relief in a court of equity need not necessarily be of such nature as to be punishable as a crime or to constitute the basis of legal action. Under this maxim, any willful act in regard to the matter in litigation, which would be condemned and pronounced wrongful by honest and fair-minded men, will be sufficient to make the hands of the applicant unclean. [2 Pomeroy, *supra,* § 404, p 143.]

It appears that no previously reported Michigan case squarely addresses the point, but we believe our conclusion that a party has no right to rely on advice to engage in blatantly

---

[9] In light of our analysis, it is unnecessary to decide whether defendants actually owed any fiduciary duties to plaintiffs.

unethical conduct is in harmony with our equity jurisprudence.[10] We believe that this is a reasonable rule. While it is appropriate for a party to secure the services of an expert for advice about legal, technical, or complex matters, we see no reason that the explicit or implicit advice of such an expert should allow a party to violate basic ethical norms that are obvious to any sentient person. Thus, contrary to the possible implication of the Court of Appeals opinion, even if a party fails to appreciate the illegality of certain conduct, that does not necessarily preclude the fact that the party engaged in such conduct from requiring application of the clean hands doctrine.

In sum, the clean hands doctrine bars the present claims. No person capable of understanding the advertising that Mr. Rose caused to be published, as Mr. Rose certainly was, could have felt that the use of a shill bidder was ethically acceptable conduct. Thus, application of the clean hands doctrine is justified because the claims in question are inextricably tied to Mr. Rose's agreement to a fraudulent

---

[10] See *Stachnik, supra* (denying equitable relief to parties who misrepresented facts related to a purported purchase agreement on the basis of the clean hands doctrine); *Isbell v Brighton Area Schs,* 199 Mich App 188; 500 NW2d 748 (1993) (holding that, under the clean hands doctrine, the plaintiff was not entitled to the equitable relief of ordering the school district to issue a high school diploma where she was denied a diploma on the basis of unexcused absences from school and that she had forged excuse notes).

shill bidder scheme, and Mr. Rose will not be heard to claim he had a right to rely on advice that he and NAG could get together to swindle the very individuals they had advertised to attract. In the trenchant and stinging words of Justice Smith in *Manning* v *Bishop of Marquette,* 345 Mich 130, 131; 76 NW2d 75 (1956), "A rogue does not appeal to our conscience."

Justice Cavanagh agrees with our rejection of plaintiffs' equitable claims, but finds it anomalous that, given the defendants' alleged initiation of the treacherous agreement at the auction, NAG will nevertheless be able to retain its commission secured from plaintiffs' proceeds for the sale of the island. While this is an understandable reaction, the reflective answer is that, unlike plaintiffs, NAG's entitlement to the commission is based in law rather than equity and, thus, the clean hands doctrine, which is only relevant in equitable actions, cannot be invoked to deny NAG its commission from the completed sale. Finally, Justice Cavanagh discusses doctrines asserted to be applicable to NAG that would preclude its entitlement to a commission because the commission was the product of an illegal contract. This argument is off-target, however, inasmuch as the commission derives from the initial auction contract, which all acknowledge was legal, rather than the later "shill bidder" agreement, which was not. Accordingly, in our view, Justice

16

Cavanagh's conclusions predicated on the illegal contract doctrine are unpersuasive because they misapprehend the origin of NAG's entitlement to the commission.[11]

IV

The Court of Appeals also reversed the trial court's grant of summary disposition in favor of defendants on the basis of plaintiffs' claims of negligence and breach of fiduciary duty in connection with defendants' conduct in suggesting the shill bidder scheme. However, we conclude that the trial court correctly granted summary disposition in favor of defendants on these claims.

With regard to the negligence claim, a necessary element to establish such a claim is showing breach of a duty owed to the plaintiff. *Case v Consumers Power Co,* 463 Mich 1, 6; 615 NW2d 17 (2000). In allegedly suggesting the shill bidder scheme, defendants did not breach any duty *to plaintiffs*. The public policy against secretly stifling competitive bidding at an auction is obviously for the protection of sincere bidders

---

[11] We are also unpersuaded by Justice Weaver's partial dissent. While she would mitigate the straightforward application of the clean hands doctrine, we believe that, even assuming the doctrine she invokes should be recognized in this state, Mr. Rose and NAG were of substantially equal moral fault with regard to the alleged shill bidder scheme (assuming as we must for present purposes that such a scheme was actually devised). They mutually agreed to a scheme that was blatantly fraudulent in seeking to deceive legitimate bidders and, accordingly, we see no reason to depart from the clean hands doctrine in this case.

at the auction, not for the protection of sellers who may be willing to engage in such a scheme. Further, it cannot be said that there was any breach of duty in defendants' "failure" to follow through with the alleged shill bidder scheme because there cannot be a legal duty to commit an illegal act. While we would agree with the partial dissent that, as a general proposition, an auctioneer owes a basic duty of competence and fairness to a seller, this duty does not extend to protecting a seller against its own willingness to engage in fraudulent conduct. Thus, plaintiffs' negligence claims fail because there is no evidence of a requisite breach of duty to plaintiffs.

Plaintiffs' breach of fiduciary duty claim must likewise fail. A breach of fiduciary duty claim requires that the plaintiff "*reasonably* reposed faith, confidence, and trust" in the fiduciary. *Beaty v Hertzberg & Golden, PC,* 456 Mich 247, 260; 571 NW2d 716 (1997) (emphasis added). For the reasons discussed in the preceding section of this opinion, plaintiffs could not reasonably have believed that it was appropriate to engage in a shill bidder scheme or reasonably have expected that they were legally entitled to have defendants follow through with such an illegal scheme. Thus, the evidence does not support plaintiffs' breach of fiduciary duty claim regardless of whether defendants actually owed any fiduciary

18

duties to plaintiffs.[12]

V

The Court of Appeals in conclusory terms also reinstated other claims of negligence and breach of fiduciary duty brought by plaintiffs. These claims amount to allegations that plaintiffs did not adequately publicize and conduct the auction. However, plaintiffs failed to provide evidence of how specifically defendants were allegedly deficient in this regard. It is not enough to create a genuine issue of material fact to provide conclusory statements that a duty was breached. See *Quinto, supra* at 371-372 (holding that an affidavit that provided "mere conclusory allegations and was devoid of detail" was insufficient to avoid summary disposition under MCR 2.116(C)(10)). Thus, we conclude that the trial court properly granted summary disposition in favor of defendants on these claims.

VI

The decision of the Court of Appeals in this case is reversed in part to the extent that it is inconsistent with

---

[12] Because it is unnecessary to the resolution of this case, we respectfully decline to address the partial dissent's conclusions regarding the scope of the fiduciary duties that auctioneers owe to their principals. Whatever those duties may be, plaintiffs still cannot have a cognizable claim for breach of fiduciary duty under these circumstances because they could not *reasonably* have relied on the shill bidder scheme.

19

this opinion. The circuit court's orders granting summary disposition in favor of defendants on the relevant claims are reinstated.

CORRIGAN, C.J., and YOUNG and MARKMAN, JJ., concurred with TAYLOR, J.

GEORGE ROSE and FRANCES ROSE,

    Plaintiffs-Appellees,

v                                              No. 116600

THE NATIONAL AUCTION GROUP,
INC., ANDREW BONE, WILLIAM BONE,
DONALD BOOZER, EDDIE HAYNES, and
EDDIE HAYNES, INC.,

    Defendants-Appellants,

and

RANDALL R. HALL,

    Defendant.

_____

CAVANAGH, J. (*concurring in part and dissenting in part*).

    The majority holds that plaintiffs' equitable claims are barred by the clean hands doctrine and in so doing affirms the trial court's order awarding the commission to defendants. The majority also holds that plaintiffs' negligence claim must fail because no duty to conduct the auction in a negligent-free fashion was owed to plaintiffs, and that plaintiffs'

breach of fiduciary duty claim cannot stand because it was unreasonable as a matter of law for the plaintiffs to believe defendants would execute an unlawful scheme. I agree that plaintiffs are barred from recovery on their equitable contract claims asserting fraud and misrepresentation. However, I would reverse the trial court's award of commission. Further, I think it is clear that defendants owed a fiduciary duty to plaintiffs and thus the negligent auctioneer claim should not be dismissed. Therefore, I respectfully dissent.

I

Plaintiffs' claims arise from a contract that is void as against public policy. Courts may grant one party restitution even though such an agreement violates public policy. II Farnsworth, Contracts, § 5.9, pp 75-76. This is rare because courts often leave parties as they find them when they enter into an illegal contract. Exceptions are made (1) where forfeiture would disproportionately affect a party whose conduct does not warrant such a harsh result, (2) where a claimant may be excusably ignorant of facts that the other party is not, or (3) where the parties are not equally wrong. *Id*. at 76-78. I agree with these principles and would hold that the parties should be left where the courts found them. Because this is an illegal contract, I would reverse the trial court's award of $29,050 in commission to defendants. It is

2

not just to deny all relief to plaintiffs and simultaneously award the defendants their commission when they are arguably more culpable than the plaintiffs, if the alleged facts are found true.  The defendants allegedly tricked their principal (the plaintiffs) by concocting an illegal shill scheme.  That the defendants failed to execute the alleged scheme does not make them less culpable.  The majority attempts to do justice by applying principles of equity, but fails by dismissing the effect of the trial court's decision to order payment of the commission.[1]  Therefore, I would hold that the trial court abused its discretion in awarding the defendants their commission.

If the defendants wish to file an action to recover the commission, a factfinder must first determine whether the alleged shill scheme was used to induce the plaintiffs to go forward with the auction.  If the evidence presented convinces the factfinder that defendants acted unlawfully or without good faith, the defendants' claim for commission should be barred.

---

[1] The majority erroneously concludes that the second agreement is wholly separate from the original contract, and that the original contract remains legally enforceable and untainted by the shill scheme.  This ignores the fact that, as a result of the alleged shill offer, Mr. Rose refrained from exercising his right to withdraw his property from the auction as permitted by the original contract.  To conceive of the parties' agreements separately fails to recognize the true nature of the alleged shill offer and leads to an unjust result.

The majority confidently asserts no duty is owed to plaintiffs because the public policy prohibiting shill bids is concerned only with the treatment of bidders. This proposition erroneously assumes the auctioneer's duty is exclusive.

Under Michigan law, a fiduciary relationship will arise "only when there is a reposing of faith, confidence and trust and the placing of reliance by one upon the judgment and advice of another." *In re Jennings Estate,* 335 Mich 241, 244; 55 NW2d 812 (1952). Other courts have applied this fundamental concept to hold that auctioneers owe fiduciary duties to their principals. In *Cristallina, SA v Christie, Manson & Woods Intl, Inc,* 117 AD2d 284, 292; 502 NYS2d 165 (1986), the court held:

> The auctioneer is the agent of the consignor. As an agent, Christie's had a fiduciary duty to act in the utmost good faith and in the interest of Cristallina, its principal, throughout their relationship. When a breach of that duty occurs, the agent is liable for damages caused to the principal, whether the cause of the action is based on contract or on negligence. [Citations omitted).]

Similarly, in *Greenwood v Koven,* 880 F Supp 186, 194 (SD NY, 1995) citing, inter alia, Restatement 2d, Agency, ch 1, § 13 (1958) ("An agent is a fiduciary with respect to matters within the scope of his agency"), the court held:

> To begin with, it is indisputable that

Christie's acted in the capacity of an agent on behalf of Koven. It is also clear that an agent such as Christie's is required under the law to act in a fiduciary capacity on behalf of its principal.

Several treatises assert the same.

It is also the duty of the auctioneer to maintain and exercise the utmost loyalty and good faith to his principal. He must not acquire or have antagonistic interests. He must not deal with the property on his own account without his principal's full knowledge and consent. He must not avail himself of his situation to make profit for himself at his principal's expense, and he must give the principal timely notice of any matters coming to his knowledge material for the principal to know for the protection of his interests. [2 Mechem, Agency (1914), § 2334, p 1918.]

Another class of agents are Auctioneers, of whom I shall merely observe here, that they are considered as agents for both parties, so that writing down the name of a purchaser at a sale is sufficient memorandum within the statute of frauds, and binds both buyer and seller. But this must be taken *secundum subjectam materiam*; for though he is agent to some purposes, he is not so to all. He is an agent to each party in different things, but not in the same things. *When he prescribes the rules of bidding, and the terms of the sale, he is the agent of the seller;* but when he puts down the name of buyer, he is agent for him only. [1 Livermore, Principal & Agent and Sales by Auction, (1986 reprint), p 77 (emphasis added).]

According to these principles, it is clear that an auctioneer has the power to bind the seller while exercising total control over the seller's property interest during the auction. Thus, an auctioneer's powers provide him with a significant amount of control and discretion, creating a duty on the part of the auctioneer to act with loyalty and in good faith toward his principal. Therefore, with regard to matters

5

within the scope of their relationship, the defendants owed a duty to the plaintiffs.

Unlike the majority, I cannot conclude as a matter of law that the plaintiff did not reasonably rely on the defendants to lawfully and in good faith communicate with him about the impending auction.  After learning of plaintiff's intention to withdraw the property from the auction block, the defendants allegedly induced the plaintiff to go forward by offering to illegally rig the event.  Thus, I would permit the trier of fact to determine the reasonableness of Mr. Rose's reliance on the alleged offer.

The holding of the Court of Appeals on the negligence claim should, therefore, be affirmed. Nonetheless, the wisdom of pursuing the issue rests with the plaintiffs as they should consider the effect of comparative negligence on their claim.

### III

For the reasons stated above, I would reverse the trial court's order awarding defendants' commission.  In addition, I would affirm the judgment of the Court of Appeals reversing the trial court's order granting summary disposition to defendants on the negligent auctioneer claim.  In all other respects, I concur with the majority.

KELLY, J., concurred with CAVANAGH, J.

**6**

GEORGE ROSE and FRANCES ROSE,

    Plaintiffs-Appellees,

v                                  No. 116600

THE NATIONAL AUCTION GROUP,
INC., ANDREW BONE, WILLIAM BONE,
DONALD BOOZER, EDDIE HAYNES, and
EDDIE HAYNES, INC.,

    Defendants-Appellants,

and

RANDALL R. HALL,

    Defendant.
_____

WEAVER, J. (*dissenting in part*).

I respectfully dissent in part from the majority opinion because I would grant the plaintiffs limited equitable relief. Specifically, I would not require plaintiffs to pay the defendants a ten-percent commission and six-percent auction fee, totaling $29,050.

I agree with the majority that we must respect the usual rule that "who comes into equity must come with clean hands". The general rule is that when two parties are in pari delicto, both involved in an illegal or fraudulent transaction, the

court will not grant the plaintiff relief. However, that rule is not meant to be applied inflexibly. In the exceptional circumstances of this case, the Court should apply the equitable principle that when both parties were involved in the fraudulent or illegal transaction, "the one whose wrong is less than that of the other may be granted relief in some circumstances." 27A Am Jur 2d § 132. It has long been recognized that the courts may interfere from motives of public policy. "Whenever public policy is considered as advanced by allowing either party to sue for relief against the transaction then relief is given to him." *Hobbs v Boatright,* 195 Mo 693; 93 SW 934, 938 (1906)[1]. See also *Grim v Cheatwood,* 208 Okla 570; 257 P2d 1049 (1953)[2] and *Baltimore*

---

[1] In *Hobbs*, the defendants enticed plaintiff to enter into a scheme to defraud other persons in a rigged footrace. Plaintiff agreed to the scheme, put up $6,000, and ultimately discovered that he had been the victim of the swindle. The court took notice that this was an ongoing fraud by the defendants, not a unique event. The court held that even though the plaintiff had participated in an illegal contract, plaintiff would be allowed to sue for relief.

[2] Plaintiff was induced to enter into a pretended and fixed poker game, with marked cards, planned by defendants and his confederates. Plaintiff was thus defrauded of a sum of money, and executed mineral deeds in satisfaction of the loss. When plaintiff discovered the fraud, he brought an action to cancel the deeds. The court allowed the plaintiff to proceed in equity because the parties were not in pari delicto, and "equity will intervene in the protection of one less guilty, notwithstanding his unclean hands." *Grim, supra,* p 572.

2

*& O R Co v Carman,* 71 Ohio App 508; 50 NE2d 358 (1942)[3].

Here the defendants moved for summary disposition under MCR 2.116(C)(7) and (10). Thus, all reasonable factual inferences should be drawn in plaintiffs' favor. Considering the pleadings in the light most favorable to the plaintiffs, one can conclude that the defendants did indeed induce the plaintiffs to enter into the illegal shill bidding scheme, and that the defendants did so for their own purposes. Given that defendants instigated the illegal scheme, it would be unjust to allow defendants to receive the auctioneer's fee and commission that were gained by their wrongdoing. Accordingly, I would reverse the order of summary disposition to allow the plaintiffs the opportunity to pursue limited equitable relief, to the extent of not requiring plaintiffs to pay the commission and auctioneer's fee. I would do this not because the plaintiffs deserve the relief, but because the defendants should not be allowed to profit from their shenanigans. Any other result would reward the defendants for enticing the plaintiffs into the shill bidder scheme.

---

[3] In *Baltimore & O R Co*, p 513, plaintiff brought an action to quiet title. Where plaintiff's failure to have the leased lands transferred to its name contributed more to causing the delinquent tax land sale than defendant's failure to act expeditiously in securing and recording a deed to himself, the court awarded defendant equitable relief, relying on the rule that "[i]f the parties appear not to have been in pari delicto, the one whose wrong is less than that of the other may be granted relief in some circumstances."

Therefore, I would reverse the Court of Appeals in part and hold that if the trier of fact finds that the defendants induced the plaintiffs to participate in the shill bidder scheme, the plaintiffs should be given limited equitable relief to ensure that the defendants do not profit from their bad acts. In all other respects I concur in the result of the majority.