*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

NEW PRODUCTS CORPORATION,

     Plaintiff/Counter Defendant-
     Appellant,

v

HARBOR SHORES BHBT LAND
DEVELOPMENT, LLC,

     Defendant/Counter Plaintiff/Third-
     Party Plaintiff-Appellee,

and

HARBOR SHORES GOLF COURSE, LLC,

     Defendant/Counter Plaintiff-
     Appellee,

and

WHIRLPOOL CORPORATION,
CORNERSTONE COMMUNITY ASSET FUND,
INC., CITY OF BENTON HARBOR, BENTON
CHARTER TOWNSHIP, and HORIZON BANK,

     Defendants-Appellees,

and

MICHIGAN MAGNET FUND E, LLC,
HORIZON BANCORP, and PNC BANK,

     Defendants,

and

UNPUBLISHED
December 19, 2019

No. 344211
Berrien Circuit Court
LC No. 11-000280-CH

-1-

LARRY ALLEN HEALD and HEIDI HEALD,

Third-Party Defendants.

Before: METER, P.J., and O'BRIEN and TUKEL, JJ.

PER CURIAM.

In this action to quiet title, plaintiff appeals as of right the trial court's order quieting title in defendants' favor under multiple theories. We affirm, albeit only on narrower grounds than the trial court.

## I. BACKGROUND

This action concerns a strip of land that now comprises the 18th hole of the Harbor Shores Golf Course—a Jack Nicklaus Signature championship golf course at which the Senior Professional Golf Association (PGA) Tour Championship Tournament is held biannually. The disputed parcel sits along the relocated Paw Paw River to the north. To the south, the disputed parcel is bordered by a parcel upon which plaintiff operates a large factory producing automobile and machine parts; there is no dispute that plaintiff holds title to this southernmost parcel. In its natural state, the disputed parcel consisted mostly of marsh land, suitable mainly for river-adjacent recreation or as a floodplain. With the approval of the National Parks Service and other governmental entities, the wetland has now been filled to create land suitable for golfing.

Ownership of the disputed parcel can be traced back to a parent parcel owned in 1950 by Elwood and Evelyn McDorman. Since then, however, ownership of the disputed parcel has been less than clear. As described by this Court in an opinion resolving an interlocutory appeal:[1]

> In 1950, Elwood and Evelyn McDorman owned a 250-foot-wide parcel of land running south from Higman Park Road to the then existing channel of the Paw Paw River, which served as the boundary between the city of Benton Harbor (Benton Harbor) and Benton Charter Township (the Township). At around that time, engineers relocated the river approximately 500 feet north. To facilitate the relocation, Benton Harbor purchased a right of way over the McDormans' land for the new channel and transferred to them a 250-foot-wide parcel located to the south of their existing parcel. After that transfer, the McDormans owned a 250-foot-wide strip of land extending from Higman Park Road in the north to Klock Road in the south. The parcel in dispute] is that part of the McDormans' land that

---

[1] This Court held that plaintiff's claims to quiet title, for a permanent injunction against trespass, and declaratory relief were to be decided by the trial court, not a jury. *New Products Corp v Harbor Shores BHBT Land Dev, LLC*, 308 Mich App 638; 866 NW2d 850 (2014).

was located in the Township before the relocation of the river, but which is now south of the relocated river.

> New Products owns and operates a manufacturing facility in Benton Harbor along Klock Road. In 1955, New Products acquired the parcel that Benton Harbor transferred to the McDormans as part of the project to relocate the river along with the disputed parcel. [The parcel was first transferred from the McDormans to John Crow and Barbara Crow, who conveyed the property to plaintiffs by quitclaim deed in 1955.] Benton Harbor taxed both parcels and New Products paid the taxes. However, the Township continued to tax the disputed parcel . . . and listed the taxpayer of record as Frank Hoffman. [*New Products Corp v Harbor Shores BHBT Land Dev, LLC*, 308 Mich App 638, 641-642; 866 NW2d 850 (2014).]

At the time, Frank Hoffman was the owner of the parcel of land situated north of the Paw Paw River, which was previously owned by the McDormans. The McDormans transferred this northernmost parcel to Glenlord Realty in 1961 via a deed that stated that land south of the relocated Paw Paw River was not included in the sale, as it was otherwise previously conveyed. Glenlord Realty subsequently transferred the northernmost parcel to Frank Hoffman, whom the township taxed both for the northernmost parcel and the disputed parcel. The Township did not assess taxes against plaintiff for the disputed parcel. In 1968, plaintiff recorded its deed to the southernmost parcel and the disputed parcel. Then:

> In 1970, the Township foreclosed against Hoffman's property for unpaid taxes. The state acquired the property, but transferred it back to Hoffman in 1973 [via redemption deed]. Larry and Heidi Heald acquired the property from Hoffman and his co-owners in 1991. Harbor Shores Development then purchased the disputed parcel . . . from the Healds in 2007. As part of a large development project, Harbor Shores Development conveyed a portion of the disputed parcel to Benton Harbor and a portion to defendant Harbor Shores Golf Course, LLC (Harbor Shores Golf). [*New Products Corp*, 308 Mich App at 642.]

When the Healds purchased the property in 1991, their realtor contacted plaintiff's then-president, Stanley Miller, to clarify ownership of the now-disputed parcel, indicating that the Hoffmans had paid taxes on the parcel for 38 years, although, "unknown to them, it was not legally theirs." There is no indication in the record that Miller ever took any action with regard to this correspondence. Then, in 2005 Chicago Title investigated the chain of title regarding the disputed parcel and was unable to determine who, in fact, owned the property.

Sometime in 2006 or 2007, plaintiff's now-president, Cheryl Miller, became aware of the Harbor Shores defendants plans for using the disputed parcel for part of its golf course and surrounding residential improvements. In 2007, Miller[2] retained a land-surveying firm to survey

---

[2] Hereinafter, references to "Miller" in this opinion refer to Cheryl Miller, not Stanly Miller.

plaintiff's property, which resulted in the firm posting "no-trespassing" signs on the disputed parcel. Also in 2007, Miller contacted the Michigan Department of Environmental Quality regarding the Harbor Shores defendants' application for a permit to fill wetlands and floodplains on the disputed parcel, indicating that the defendants were not the rightful owners of the property.

Sometime in 2008, Miller witnessed plans for the proposed development in the *Herald Palladium*, which indicated that a golf-course hole would be placed on the disputed parcel. In March 2008, she contacted a trustee of Harbor Shores requesting a final version of the plans. In April 2008, Harbor Shores's counsel sent Miller a letter arguing that plaintiff's assertion of ownership over the disputed parcel was incorrect, stating:

> While I have not had an opportunity to review the vesting deed by which New Products took title to its portion of the property in question, the tax description of that property on file with Berrien County purports to run to the center of the Paw Paw River. If the New Products property in fact extended to the center of the Paw Paw River as it exists today, then New Products would own a great deal more property than it originally acquired, the Heald's [sic] would not have owned the property they sold Harbor Shores, and the conclusions set forth in New Products' letter would be correct. But, of course, this cannot be, and there is an explanation.
>
> The bed of the Paw Paw River was physically moved some years ago from its former location to a place considerably north of that. Moving a monument that demarks a property boundary does not, of course, actually extend the property's area. Instead, one seeking to ascertain the actual boundaries of the property must reestablish the original location of the boundary. A river, like a tree, a pile of stones, or a concrete post, is nothing more than a monument. When the river was moved north, the boundary of the New Products property did not follow it. Instead, that boundary remained the same, and its location can be ascertained through proper surveying techniques.

Plaintiff responded to the letter through its own legal counsel, who emphasized that plaintiff's deed referenced the Paw Paw River "as relocated" and indicated that any future encroachment on the disputed parcel would be considered a trespass. In turn, Harbor Shores's counsel sent plaintiff a final letter dated July 1, 2008, stating that, if plaintiff held an interest in the disputed parcel, it was divested of any title to the property by its failure to pay property taxes. Harbor Shores's counsel attached to the letter a copy of the 1973 redemption deed and reiterated Harbor Shores's position that the boundary of plaintiff's property was south of the original river channel. Harbor Shores's counsel invited further communication with plaintiff, stating, "To the extent it would be helpful, I would be pleased to discuss this matter with you by telephone or in person." Plaintiff's counsel did not respond to this last letter.

For her part, Miller attended a meeting with Harbor Shores representatives in September 2008 at which the parties discussed potential conflicts between the disputed parcel's use as a golf course and plaintiff's factory operation. Before the meeting, Miller had sent Harbor Shores's counsel a letter indicating that there was no record of any tax delinquency or property sale pertaining to plaintiff; at the meeting, however, ownership of the disputed parcel was not

discussed. Follow-up correspondence indicates that Miller was concerned about flood protection, given that plaintiff had erected flood-control berms on or near the disputed parcel. Again, ownership was not discussed.

In late September 2008, plaintiff began filling wetlands on the disputed property in preparation for its construction of the 18th hole of the proposed golf course. About that time, Miller urged plaintiff's counsel to file a lawsuit preventing the construction of the golf course. Plaintiff's counsel agreed that a lawsuit and a preliminary injunction were necessary to protect plaintiff's interests, but never filed a complaint. Other communications indicate that plaintiff and its counsel were disputing attorney fees at the time.

Harbor Shores opened the golf course in 2010. The Senior PGA Championship Tournament was scheduled to be held at Harbor Shores in even-numbered years through 2024. The course is a Jack Nicklaus Signature championship golf course and the 18th hole sits on the disputed parcel. The remaining 17 holes sit on contiguous property, part of which made up the original northernmost McDorman parcel. Also completed in tandem with the golf course were several residential developments; in total, the mixed use development encompasses 530 acres. Additionally, part of the disputed parcel was deeded to the City of Benton Harbor in exchange for the city's agreement to repurpose a city park within the development for the golf course. Construction on the disputed parcel ultimately required 34,000 yards of dirt, or 1,200 truckloads. The 18th hole was seeded in 2009 and opened for play in August 2010. As it currently stands, there is no land available for an alternative 18th-hole location; although an alternative location existed as late as September 2010, residential housing has been constructed there. Testimony indicated that alterations to the 18th hole would require the approval of Jack Nicklaus's design firm and would likely result in the loss of the course's status as a championship course.

Plaintiff did not file its complaint until September 2011, asserting *inter alia* a claim for quiet title. Harbor Shores defendants filed a counterclaim for quiet title under MCL 600.2932 and the marketable record title act. The trial court found *inter alia* that plaintiff was subject to tax foreclosure for failing to pay property tax to the township on the disputed parcel. The trial court also found that the Crows' nonpayment of property tax caused the county to foreclose on the disputed parcel, eventually leading to the state's conveyance of the disputed parcel to Hoffman via the redemption deed. Regarding equity, the trial court found that plaintiff's delay in asserting its legal rights to ownership of the disputed parcel until after the completion of the 18th hole and the opening of the golf course barred plaintiff from asserting title to the disputed property under the doctrines of laches, unclear hands, and "waiver and estoppel." The trial court also concluded that the Harbor Shores defendants were entitled to title under the marketable record title act. This appeal followed.

## II. ANALYSIS

### A. TAX FORECLOSURE AND REDEMPTION

We first address plaintiff's challenges to the trial court's conclusion that plaintiff was divested of title by the tax events of 1971 to 1973. We review the trial court's factual findings for clear error, *City of Novi v Robert Adell Children's Funded Trust*, 473 Mich 242, 249; 701 NW2d

144 (2005), and its legal conclusions de novo, *In re Treasurer of Wayne Co for Foreclosure*, 478 Mich 1, 6; 732 NW2d 458 (2007).

Plaintiff raises several arguments on appeal challenging the trial court's factual findings and conclusions. As an initial matter, we note that the trial court's conclusion that the Crows' nonpayment of property tax on the disputed parcel caused the county to foreclose on the property is not supported by the record. There is no evidence that the township taxed the Crows for the disputed parcel or that the Crows failed to pay any property tax; rather, the record shows that the township taxed the disputed parcel to Hoffman, whose nonpayment led to the foreclosure proceedings and whose subsequent payment of the delinquency led to the redemption deed. The trial court mistakenly concluded that the Crows nonpayment caused the county to foreclose on the disputed parcel and eventually issue a redemption deed to Hoffman. Not only is this finding inaccurate, the trial court also provided no authority for the proposition that a non-owner can oust the owner of real property and obtain title for himself by paying the owner's tax delinquency.

Moreover, while we will not address all of plaintiff's arguments regarding the trial court's tax proceedings findings, perhaps the most significant of plaintiff's arguments concerning the property tax history is that plaintiff was never given notice of the tax proceedings. "[D]ue process requires the government to provide notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *In re Treasurer of Wayne*, 478 Mich at 9. There is no evidence that the township gave plaintiff notice of its tax assessments or the foreclosure proceeding, or that plaintiff received actual notice. Additionally, even if we were to consider the redemption deed to Hoffman akin to a tax sale, plaintiffs never received notice of the sale. See 1970 CL 211.140 (requiring notice to be given to the last grantee in the regular chain of title before property may be transferred via tax sale).

Is short, the trial court's analysis of the tax proceedings between 1971 and 1973 was inaccurate factually and incomplete legally. Accordingly, we conclude that the trial court erred by quieting title in the defendants' favor on the basis of the tax proceedings.

B. EQUITY

Although we conclude that the trial court's tax-proceeding conclusions were erroneous, we nonetheless affirm the trial court's rulings in equity. The statute that authorizes an action to quiet title, MCL 600.2932, provides that "[a]ctions under this section are equitable in nature." MCL 600.2932(5). Thus, "[a] suit to quiet title or remove a cloud on a title is one in equity." *McFerren v B & B Inv Group*, 253 Mich App 517, 522; 655 NW2d 779 (2002). We "review de novo a trial court's decision whether to apply equitable doctrines," *Home-Owners Ins Co v Perkins*, ___ Mich App ___, ___; ___ NW2d ___ (2019) (Docket No. 344926); slip op at 4, but review the trial court's factual findings supporting its decision for clear error, *McFerren*, 253 Mich App at 522. Although we closely scrutinize the trial court's factual findings in an equity case, we are cognizant of the trial court's special opportunity to view the evidence in the first instance. *In re Conant Estate,* 130 Mich App 493, 498-499; 343 NW2d 593 (1983).

The trial court concluded that the defendants were entitled to judgment in equity under the doctrines of laches, unclean hands, and estoppel. "Estoppel by laches is the failure to do something which should be done under the circumstances or the failure to claim or enforce a right at the proper time." *Wells Fargo Bank, NA v Null*, 304 Mich App 508, 537-538; 847 NW2d 657 (2014). "A party guilty of laches is estopped from asserting a right it could have and should have asserted earlier." *Perkins*, ___ Mich App at ___, slip op at 8-9 (internal citation and quotation marks omitted). "To successfully assert laches as an affirmative defense, a defendant must demonstrate prejudice occasioned by the delay." *Wells Fargo Bank*, 304 Mich App at 538. The doctrine of laches may bar a claim even where the action is brought within the applicable limitations period. *Rowry v Univ of Mich*, 441 Mich 1, 11; 490 NW2d 305 (1992).

The unclean-hands doctrine is "a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, *however improper may have been the behavior of the* [opposing party]." *Rose v Nat'l Auction Group*, 466 Mich 453, 463; 646 NW2d 455 (2002) (internal citation and block notation omitted). Any willful act that transgresses equitable standards of conduct is sufficient to allow a court to deny a party equitable relief. *Stachnik v Winkel*, 394 Mich 375, 386; 230 NW2d 529 (1975).

Equitable estoppel occurs when "(1) a party by representation, admissions, or silence, intentionally or negligently induces another party to believe facts; (2) the other party justifiably relies and acts on this belief; and (3) the other party will be prejudiced if the first party is permitted to deny the existence of the facts." *Twp of Williamstown v Sandalwood Ranch, LLC*, 325 Mich App 541, 553; 927 NW2d 262, 270 (2018) (internal citation and block notation omitted). "Equitable estoppel is not an independent cause of action, but instead a doctrine that may assist a party by precluding the opposing party from asserting or denying the existence of a particular fact." *Conagra, Inc v Farmers State Bank*, 237 Mich App 109, 140-141; 602 NW2d 390 (1999). In the context of property rights, "estoppel may be invoked as an equitable defense where the plaintiff has observed the defendant dealing with his property in a manner inconsistent with his rights and makes no objection, while the defendant changes his position in reliance on the plaintiff's silence." *Thiel v Goyings*, ___ Mich ___, ___ n 37; ___ NW2d ___ (2019) (Docket No. 156708), slip op at 13 (VIVIANO, J., concurring), quoting 42 Am Jur Proof of Facts 3d 463, 482, § 10 (discussing estoppel in the context of a breach of covenant).

In this case, plaintiff knew about the defendants' plan to build a golf-course hole on the disputed property by at least March 2008. Plaintiff initially asserted its title to the disputed property; by the end of September, however, the defendants had made clear that they would not recognize plaintiff's title, asserting instead that the tax proceedings granted title to their predecessors in interest. The defendants invited plaintiff to discuss the issue further, but plaintiff did not avail itself of this opportunity. Despite having at least one meeting and other further communications with the defendants, plaintiff did not again raise the ownership issue.

The Harbor Shores defendants started filling wetlands on the disputed property in late September 2008. Plaintiff's president, Miller, recognized that this action was inconsistent with plaintiff's claim to title, but, despite Millers concerns, she did not further discuss the ownership issue with the defendants and plaintiff's counsel did not file a complaint or seek an injunction. Rather, plaintiff waited until 2011—after the golf course had been completed and had opened to

the public—to file its complaint and seek an injunction. Plaintiff lodged no complaint while 1,200 truckloads filled the disputed parcel with 34,000 yards of dirt; while construction crews installed drainage, graded, and seeded the parcel; and while the Harbor Shores defendants undertook other construction projects in places that the 18th hole could have been placed. Plaintiffs waited for months while the grass grew on the 18th hole and only took action after the public started golfing on it.

The record reveals that open lines of communication existed between plaintiff and the relevant defendants. In fact, after explaining its position regarding its title to the disputed property, Harbor Shores's attorney invited additional discussion on the issue. Having received no further objections on the title issue, despite communication on other issues, the defendants reasonably believed that plaintiff's objection to their claim of title had ceased. Indeed, this belief could only have been enhanced by plaintiff's silence on the issue throughout the entirety of the construction of the 18th hole. On this record, we agree with the trial court that plaintiff's silence on the title issue inequitably induced the defendants' belief that the issue was resolved and that the Harbor Shores defendants justifiably relied on this belief to complete its development on the disputed parcel and related property.[3]

We also agree with the trial court that the defendants were sufficiently prejudiced by plaintiff's delay to estop plaintiff from reviving its objection to defendants' title claim in the quiet-title action. By the time the case came before the trial court, the golf course had already been completed and opened to the public. The Harbor Shores defendants had already constructed residential housing or other buildings in places where the 18th hole could have been placed; moreover, they had deeded a mitigation parcel on the disputed property to the City of Benton Harbor in exchange for the city's agreement to redevelop a city park and there was no other suitable land left to be used as this mitigation parcel. Theoretically, at the time of trial, the 18th hole could have been shortened from a par-4 to a par-3 hole which would not encroach on the disputed parcel; however, doing so would require the approval of Jack Nicklaus's firm, of which there was no guarantee. Moreover, shortening the hole would jeopardize the course's designation as a Jack Nicklaus Signature course and would likely mean that the course would no longer be considered a championship golf course. Losing its status as a championship course likely would mean that the course could no longer host the Senior PGA Championship Tournament, despite plans to hold the tournament there biannually through 2024. In turn, loss of these statuses jeopardized Harbor Shores Golf Course's customer base, particularly those customers attracted to the course because of its status as a Jack Nicklaus Signature championship

---

[3] To the extent that plaintiff blames its delay on its counsel, we note that plaintiff could have ended its relationship with its counsel and hired alternative counsel. In any event, any error on counsel's part may be remedied monetarily through a malpractice action. Similarly, plaintiff blames the delay on its preoccupation with the bankruptcy of one of its most important clients, General Motors. That an unrelated legal entity filed for bankruptcy, however, does not absolve plaintiff of its duty as a landowner to assert its ownership interests. Plaintiff was aware of the development and there is no indication in the record that General Motor's bankruptcy precluded plaintiff in any way from asserting its legal rights.

golf course associated with the PGA. Even harder to quantify would be the economic impact of the loss of the Senior PGA championship and the course's championship designation on the residential portions of the development.

In short, we agree with the trial court that, under the doctrines of laches, unclean hands, and estoppel, plaintiff should be estopped from reviving its objection to defendants' title to the disputed parcel. Plaintiff, however, raises two arguments on appeal challenging the application of the doctrine of laches to the instant dispute, which require further discussion. Neither argument is meritorious.

First, plaintiff argues that the defendants cannot rely on laches because a remedy exists under MCR 3.411(F). MCR 3.411 governs procedure in civil actions to determine interests in land under MCL 600.2932 and MCR 3.411(F) provides a procedure in which the non-prevailing party may present a claim for the value of buildings erected and improvements made on the disputed property:

> (1) Within 28 days after the finding of title, a party may file a claim against the party found to have title to the premises for the amount that the present value of the premises has been increased by the erection of buildings or the making of improvements by the party making the claim or those through whom he or she claims.
>
> (2) The court shall hear evidence as to the value of the buildings erected and the improvements made on the premises, and the value the premises would have if they had not been improved or built upon. The court shall determine the amount the premises would be worth at the time of the claim had the premises not been improved, and the amount the value of the premises was increased at the time of the claim by the buildings erected and improvements made.
>
> (3) The party claiming the value of the improvements may not recover their value if they were made in bad faith.

While it is true that MCR 3.411(F) would grant certain of the defendants the right to recover for the physical improvements made to the disputed property—e.g., the installation of drainage and the filling, grading, and seeding of the property—such a remedy would be wholly inadequate in this case. Indeed, as already shown, the bulk of the Harbor Shores defendants' losses from an adverse title ruling would not be in the form of lost construction costs, but rather by the loss of an opportunity to erect the 18th hole in a different location to retain the golf course's status as a Jack Nicklaus Signature championship golf course. Without repeating the above analysis, the record shows that plaintiff's delay in filing its suit artificially increased the risks associated with the property action, such that an adverse property ruling would have drastic, seemingly permanent economic consequences for the development as a whole, which could not be remedied by a monetary award equal to the increased value of the disputed parcel itself. Accordingly, we conclude that MCR 3.411(F) poses no impediment to the trial court's laches ruling, because the remedy provided by MCR 3.411(F) is inadequate to cure the prejudice defendants suffered by plaintiff's delay in filing its suit.

Similarly, plaintiff argues that the doctrine of laches has no application where a title is validly recorded. In support of this position, plaintiff cites *Angeloff v Smith*, 254 Mich 99, 101; 235 NW 823 (1931), for its proposition that: "Where the right is not an executory one but is a vested legal title, the doctrine of laches has little, if any, application. 21 CJ p 215. This is particularly true where the title is of record for the world to see." Having reviewed this case, which involved a divorcee's challenge to the sale of joint property after divorce, see *id*. at 100-101, we cannot conclude that *Angeloff* establishes such a broad prohibition. Rather, despite this seemingly expansive language, the *Angeloff* court actually engaged in a traditional laches analysis: noting that the equities ran in the plaintiff's favor because she did not engage in any undue delay and the purchasers bought the property with notice of her title. *Id*. at 101-102. Our Supreme Court concluded, "The case is not accompanied by elements of estoppel, and plaintiff cannot, *under the circumstances*, be held guilty of laches." *Id*. at 102 (emphasis added).

This is not the type of analysis establishing an absolute rule prohibiting laches from defeating a recorded property interest; at most, *Angeloff* stands for the proposition that only in rare cases will laches defeat a recorded property interest. See *Zlydasdyk v Lucas*, 29 Mich App 584, 587-588; 185 NW2d 838 (1971) (reversing the trial court's ruling rejecting the defendant's argument that the doctrine of laches could not apply where the plaintiff held record title to land). If it is indeed a rare case in which laches will defeat a recorded property interest, we believe that the drastic consequences attendant to plaintiff's delay in this case establishes the exception to the general proposition. In any event, we agree with the trial court that plaintiff was estopped from challenging the defendants' title under the doctrines of unclean hands and estoppel and we are unable to find any challenge to those theories in *Angeloff*.

Accordingly, we affirm the trial court's ruling that defendants were entitled to judgment in equity under the doctrines of laches, unclean hands, and estoppel.

## C. MARKETABLE RECORD TITLE ACT

Finally, although we technically need not address this case further, given our affirmance of the trial court's equity rulings, we will briefly address the trial court's conclusion that the Harbor Shores defendants held title to the disputed parcel under the marketable record title act, MCL 565.101 *et seq*.

MCL 565.101(1) provides:

Any person, that has the legal capacity to own land in this state, that has an unbroken chain of title of record to any interest in land for 20 years for mineral interests and 40 years for other interests, is at the end of the applicable period considered to have a marketable record title to that interest, subject only to claims to that interest and defects of title as are not extinguished or barred by application of this act and subject also to any interests and defects as are inherent in the provisions and limitations contained in the muniments of which the chain of record title is formed and that are recorded within 2 years after the effective date of the amendatory act that added section 2(2)[1] or during the 20-year period for mineral interests and the 40-year period for other interests. However, a person is

not considered to have a marketable record title by reason of this act if the land in which the interest exists is in the hostile possession of another.

At the time relevant, MCL 565.102 provided[4]:

> A person is considered to have an unbroken chain of title to an interest in land as provided in section 1 when the official public records disclose either of the following:

> (a) A conveyance or other title transaction not less than 20 years in the past for mineral interests and 40 years for other interests, which conveyance or other title transaction purports to create the interest in that person, with nothing appearing of record purporting to divest that person of the purported interest.

> (b) A conveyance or other title transaction not less than 20 years in the past for mineral interests and 40 years for other interests, which conveyance or other title transaction purports to create the interest in some other person and other conveyances or title transactions of record by which the purported interest has become vested in the person first referred to in this section, with nothing appearing of record purporting to divest the person first referred to in this section of the purported interest.

The 1971 tax deed was recorded on August 6, 1971. Although the tax deed and subsequent redemption deeds were defective for the reasons described earlier, they nonetheless "purport[] to create the interest" in the state. MCL 565.102(1)(b). The redemption deed "purports" to pass this interest to Hoffman. Plaintiff emphasizes that the tax deed was nullified by the redemption deed, and that the redemption deed did nothing more than restore the status quo before the tax foreclosure, but the key word in the statute is "purports." The pertinent inquiry is not whether the recorded instruments were based entirely on valid transactions, but whether they purported to declare a conveyance of record. Consequently, the recorded tax deed

---

[4] MCL 565.102 was amended by 2018 PA 572, effective March 29, 2019, to add Subsection 2, which provides:

> For purposes of this section, except as to mineral interests, a conveyance or other title transaction in the chain of title purports to divest an interest in the property only if it creates the divestment or if it specifically refers by liber and page or other county-assigned unique identifying number to a previously recorded conveyance or other title transaction that created the divestment.

Because Subsection (2) did not become effective until after plaintiff filed this lawsuit, it is not applicable. If it applied, however, plaintiff would prevail because none of the title transactions created plaintiff's divestment in the disputed parcel or referred by liber and page to a transaction that created a divestment.

-11-

began a 40-year chain of unbroken record title as of the date plaintiff filed its complaint in September 2011. Accordingly, the trial court did not err by concluding that the defendants were entitled to judgment under the marketable record title act.

Affirmed.

/s/ Patrick M. Meter
/s/ Colleen A. O'Brien
/s/ Jonathan Tukel